# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal Case No. 06-00032 (HHK)** |
| | **:** | |
| **GEORGE MCKOY,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| _____ | **:** | |

## UNITED STATES' PROPOSED FINDINGS OF FACT
## <u>AND CONCLUSIONS OF LAW</u>

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully proposes the attached Findings of Fact and Conclusions of

Law in the above-captioned case.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:    _____

Donnell W. Turner
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C.  20530
(202) 305-1419

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 06-00032 (HHK)** |
| | : | |
| **GEORGE MCKOY,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court on November 16, 2006, upon the motion of Defendant,

George McKoy, to suppress tangible evidence in the case.  The Court held a suppression hearing

on the motion, and at the conclusion of the hearing, the Court directed the parties to submit

proposed findings and conclusions of law with respect to the motion and the evidence presented

at the hearing.  Having considered the evidence presented in the case, and the arguments of

counsel for Defendant and the United States, the Court makes the following findings of fact and

conclusions of law:

### I.     FACTUAL FINDINGS

1.     On a cold evening on Tuesday January 3, 2006, United States Park Police (hereinafter

"USPP") Officer Jason Omo, a four-year member of USPP, was operating a marked police

cruiser while on patrol in the area of Dubois and 34th Streets, S.E., Washington, D.C. (Tr. (A): 5-

6).[1]  This is a residential area that Officer Omo had been patrolling for several years, and was

_____

[1] "Tr.(A):__" refers to the morning hearing transcript of November 16, 2006, at the indicated page number(s), while "Tr.(P):__" refers to the afternoon transcript on that day at the indicated page number(s).

(continued...)

known to him and other officers as a high drug-trafficking area, where he and other officers had received numerous citizens' complaints related to illegal drug activity and had made many drug- and weapons-related arrests (Tr. (A): 12-13, 89).

    2.    At approximately 11:54 p.m., Omo observed a green 2003 Jaguar driving northbound down 34th Street, S.E., towards a three-way intersection at Dubois and 34th Streets, and come to a stop towards the center of the road in the travel lane, right next to a parked car within the intersection (Tr. (A): 7-9; 29-30, 32-33, 35; Tr. (P): 5).[2]  Based on his observation, Officer Omo determined that the driver of the Jaguar was obstructing traffic in violation of the District of Columbia's traffic laws  (Tr. (A): 11-12).[3]  Omo continued to watch the car when an

---

[1]/(...continued)
Officer Omo testified that it was cold that evening, but he could not recall whether he was wearing a coat himself (Tr. (A): 10).

[2]/ Officer Omo described the intersection as a "T" intersection, explaining that "Dubois intersects 34th Street, making a T," and that Dubois Street "does not cross" 34th Street (Tr. (A): 8-9).   Officer Omo was sitting at a red light at Eli Street and Minnesota Ave., S.E., when he observed Defendant's vehicle pull to a stop at the intersection of Dubois and 34th Streets, S.E. (Tr. (A): 11, 30, 34).

[3]/ On cross-examination, Officer Omo testified that, given where Defendant was parked, cars could still proceed around him (Tr. (A): 32).  However, when asked whether he believed Defendant was preventing anyone from getting to where they were going, Omo responded, "Unless they were trying to get where he is" (Tr. (A): 32-33).  Omo eventually issued Defendant a citation for "obstructing traffic," and wrote it in on the traffic citation under the section entitled "DMV Moving Violation – Other: _____ " (Tr. (A): 26, 70-71, 73, 74; see Defense Exh. 4).  Omo testified that he believed that the "obstruction of traffic" offense, which he relied on in issuing the citation to Defendant, was found in Title 18, Section 2405.1(a) of the District of Columbia Traffic Code (Tr. (A): 92; see Gov't. Exh. 1).  That section specifically provides that "[n]o person shall stop, stand, or park a vehicle . . . within an intersection," unless it is done so "to avoid conflict with other traffic, in compliance with law, or at the direction of a police officer or traffic control device." D.C. Traffic Code, Title 18, Section 2405.1(a).  Omo acknowledged that he considered this offense a moving violation.  The Government concedes, however, that Title 18, Section 2405.1(a) is a non-moving violation provision, as the Chapter is titled

(continued...)

unknown man, dressed only in jeans and a white t-shirt, emerged from a nearby residential

building and got in the front passenger seat of the car, where he remained for approximately

thirty seconds, then exited the car and went back into the building (Tr. (A): 10-11).  The driver of

the car then pulled away and continued northbound down 34th Street, S.E. (Tr. (A): 11).

3.      Because he had just witnessed the driver of the car commit a traffic infraction,

Officer Omo decided to initiate a traffic stop on the car (Tr. (A): 11-12).  In addition, based upon

Officer Omo's experience in having participated in a number of drug arrests, and his familiarity

with the area, Officer Omo believed that he had just witnessed a drug transaction take place (Tr.

(A): 12-14).  Officer Omo pursued the vehicle and eventually initiated a traffic stop

approximately four blocks away from the original scene, at 34th and A Streets, S.E.  (Tr. (A): 12).

Omo then exited his cruiser and made contact with the vehicle's driver, Defendant George

McKoy, who was the only occupant of the vehicle (Tr. (A): 14).  Officer Omo first asked

Defendant for his license and registration, then he asked Defendant about the individual who had

just entered and exited Defendant's car (Tr. (id.).[4]  Defendant responded that he had just dropped

someone off (id.).  Omo then confronted Defendant with the fact that he had just observed an

individual come out of the building and get inside Defendant's car, at which point Defendant

"became kind of evasive" and "wouldn't respond to that question anymore" (id.).[5]  During his

_____

[3]/(...continued)
"Stopping, Standing, Parking, and Other Non-Moving Violations."

[4]/ Defendant produced his license and registration.  The car was not registered to Defendant but
rather to a Bernadette Lacey (Tr. (A): 16; see Defense Exh. 3, at 4).

[5]/ Specifically, Officer Omo asked Defendant "[w]hy . . . what he was telling me conflicted
with what I saw" (Tr. (A): 14).  In response to this question, Omo said, Defendant "maintained
(continued...)

4

conversation with Defendant, Officer Omo observed that Defendant "kept breaking eye contact," was "evasive" to his questions, and appeared "nervous and fidgety" (Tr. (A): 15). In addition, when Officer Omo asked defendant where he was going, defendant responded that he was "going to get a haircut up the street" (id.).

4.      At some point during the traffic stop, Officer Omo contacted USPP Officer Eduardo Delgado via cell phone and asked Delgado to back him up during the stop (Tr. (A): 17). Also, at approximately 12:02 a.m., Omo called the police dispatcher and requested the assistance of a canine officer (Tr. (A): 18).[6] Accordingly, USPP Canine Officer Jeff Daugherty responded to the call and began proceeding to 34th and A Streets, S.E., in order to assist Officer Omo (Tr. (P): 24-25, 53).

5.      While waiting for his backup to arrive, Officer Omo checked the status of Defendant's driving permit, and he conducted an NCIC/WALES criminal record check of Defendant (Tr. (A): 21-22). These checks took one or two minutes (Tr. (A): 22). Approximately five to seven minutes after the Defendant's vehicle was stopped, Officer Delgado arrived on the scene (Tr. (A) 19-20; Tr. (P): 55-56, 78). Once Delgado arrived, both he and Officer Omo approached Defendant as the defendant sat in his vehicle (Tr. (A): 22-23; Tr. (P): 58). As they walked up to Defendant's vehicle, however, Defendant was talking on his cellular phone. (Tr. (P): 63). The officers attempted to talk with the defendant. However, the conversation was

---

[5] (...continued)
the story that he was just dropping someone off" (id.).

[6] According to the Radio Log Transcription, at approximately 12:01 a.m. Officer Omo asked the dispatcher whether "any drug dogs [were] working" that evening (Tr. (A): 57; see Defense Exh. 3, at 2).

5

interrupted by the defendant talking on his cellular phone, so the police instructed the defendant

to hang up.  Although Defendant at first complied with their instruction, the telephone rang

again, and Defendant answered it and again began to talk on it (id.).  Officer Omo again directed

Defendant to hang up the telephone, and Defendant responded that it was his mother on the

phone and asked whether Omo would talk to her (Tr. (P): 63-64).  Officer Omo said "no", told

Defendant a third time to hang up the phone, and then asked Defendant to step out of the vehicle

(id.).  The defendant then opened the driver's door and stepped out of the car, but left the door

open (Tr. (A): 23, 46; Tr. (P): 65).  Neither officer had asked Defendant to leave the door open,

nor did either officer shut the door (id.).

6.  After Defendant exited the vehicle, the officers asked him to step to the front of it (Tr.

(P): 65).  At this point, Defendant asked the officers why they had stopped him and added that he

was only "trying to go to the barber shop" (id.).  Officer Delgado then asked Defendant for

permission to search his vehicle, at which point Defendant did not respond, but rather looked

downward and broke eye contact with the officers (Tr. (P): 66-67).  Officer Delgado asked

defendant at least three times whether he would consent to a search of his car, but defendant

failed to respond each time (id.).  During this conversation, Officer Delgado observed Defendant

pacing back and forth, shifting his weight on his feet, and crossing his arms (Tr. (P): 66).

7.  At approximately 12:10 a.m., canine officer Jeff Daugherty arrived on the scene,

along with his drug detection dog, Finnegan (Tr. (A): 23-24; see Defense Exh. 3, at 3).[7]  Officer

---

[7] Officer Daugherty testified that it took him approximately seven to eight minutes after
receiving the request for a drug dog request from to arrive at the scene (Tr. (P): 24).  Officer
Daugherty testified on cross-examination that he was originally given the wrong location to
respond to by the dispatcher, but he discovered the error while en route and the mistake did not

(continued...)

Daugherty, an eighteen-year member of USPP, had worked in the canine unit of USPP for twelve years, and he had been working with his dog Finnegan for the past seven years (Tr. (P): 16-17). [8] Prior to January 2006, Finnegan's track record in detecting drugs was "very reliable" (Tr. (P): 22-23).

8.    Officer Omo initially advised Officer Daugherty of the situation, then asked Daugherty to allow his dog Finnegan to perform an exterior scan of the car for the detection of the odor of drugs (Tr. (A): 23).[9]  Officer Daugherty then immediately removed Finnegan from his police cruiser and began an initial scan of Defendant's vehicle (Tr. (A): 23, 27; Tr. (P): 28-29, 39-40).[10]  Officer Daugherty initially observed that the driver's side door to Defendant's vehicle was open (Tr. (P): 28, 40).  With Finnegan on a leash, Officer Daugherty and Finnegan began in the front of the car and proceeded in a counter-clockwise direction (Tr. (P): 28-29).  While passing the open driver's side door of the car, Finnegan jumped into the driver's seat, but was immediately removed from the car by Officer Daugherty (Tr. (P): 29-30, 39-40).  Officer

---

[7]/(...continued)
delay his arrival at 34th and A Streets, S.E.  (Tr. (P): 38-39, 48, 50-52).

[8]/ As of January 2006, Officer Daugherty and Finnegan were together duly certified in the areas of police patrol and drug detection, by the United States Police Canine Association (Tr. (P): 16-23). Officer Daugherty testified that he and Finnegan had been certified annually for the past seven years in police patrol and drug detection (Tr. (P): 20).  In order to obtain certification in patrol and drug detection, Daugherty testified that he and Finnegan were together required to go through a 12 to 14-week instruction period for patrol, followed by an 8-week course in drug detection (Tr. (P): 16-23).  Among the drugs that Finnegan had been trained to smell were marijuana, hashish, cocaine, cocaine base, or "crack," and heroin (Tr. (P): 22).

[9]/ Once Officer Omo advised Daugherty, Omo returned to his cruiser and finished writing Defendant's citation (Tr. (B): 14; see Defense Exh. 4).

[10]/ Officer Daugherty also testified that he and Finnegan had performed similar scans at least a hundred times prior to this occasion (Tr. (P): 36).

Daugherty had not directed Finnegan to enter the car, and Finnegan did not display any change in behavior while he was inside the car (id.).[11]

9.      Once Finnegan was removed from the car, the initial scan continued in a counter-clockwise direction; when Finnegan arrived at the left tail lamp, Officer Daugherty noticed that Finnegan had begun sniffing intensely, but he did not stay with that area and did not alert at that time (Tr. (P): 29-31, 41-42).  Officer Daugherty and Finnegan then continued around to the front of the car and completed the initial scan, then turned around and headed back around the car in a clockwise direction (id.).  Once again, when Finnegan arrived at the left tail lamp, he started sniffing intensely in that area, and consequently showed some interest in the area, but he continued on and did not alert to the smell of narcotics (Tr. (P): 29-34).

10.      Officer Daugherty continued to walk Finnegan clockwise around the car towards the front, and brought him to the open driver's side door a second time (Tr. (P): 31-32).  Once Finnegan arrived there, Officer Daugherty noticed that Finnegan "turned his head, sniffed it, and then jumped in the vehicle right away," thus signaling to Daugherty that "there[ was] definitely an odor [in which Finnegan] was interested" (Tr. (P): 34).  At that point, Finnegan jumped inside the car, went immediately to the center console area, and then sniffed it intensely (id.).  He then jumped over into the passenger seat, turned to face Officer Daugherty, then placed his nose back on the center console and sat, thus indicating a final response for the smell of narcotics (id.).  The entire scan of the defendant's car took between 30 and 40 seconds to complete (Tr. (P): 35).  Once Finnegan alerted to the smell of narcotics in the car, Officer Daugherty immediately

---

[11] Officer Daugherty testified that Finnegan "alerts" to the odor of narcotics when, after he begins sniffing intensely in a certain area, he will remain there, close his mouth and begin sniffing more intensely in the area, and then sit as a "final response" (Tr. (P): 23-24, 31-33).

advised Officers Omo and Delgado, and the officers began searching the car (Tr. (A): 24-25; Tr. (P): 67).

11.    A search of the center console yielded a clear sandwich bag containing three ziplock bags of crack cocaine, and an orange ziplock bag containing marijuana (Tr. (A): 25; Tr. (P): 68).  Officer Delgado searched the trunk; near the left rear tail lamp, inside a backpack, he found clear ziplock baggies containing additional crack, empty ziplock baggies, a razor blade, and a digital scale with white residue, and U.S. currency (Tr. (A): 25; Tr. (P): 68-72).  Also inside the backpack were several items of mail addressed to Defendant (Tr. (P): 69).  The crack, along with the packaging, weighed approximately 151 grams (Tr. (P): 72).  Defendant was placed under arrest thereafter immediately and subsequently transported to the police station by Officer Omo (Tr. (P): 73).

## II.    CONCLUSIONS OF LAW

### A.    The Traffic Stop Was Lawful and Constitutionally Permissible.

12.    In the instant case, Officer Omo witnessed firsthand Defendant bring his vehicle to a stop towards the center of the road in the travel lane, right next to a parked car within the intersection at 34th and Dubois Streets, S.E.  (Tr. (A): 32-33).  Thus, Omo reasonably determined that Defendant was obstructing traffic and therefore had violated Title 18, Section 2405.1(a) of the District of Columbia Traffic Code.  Consequently, Omo's actions in effecting a traffic stop on Defendant's vehicle were lawful.  Indeed, "[t]he Fourth Amendment does not bar the police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one."  United States v. Mitchell, 951 F.2d 1291, 1295 (D.C. Cir. 1991).  See Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop

an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred"); Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) ("there is no

question about the propriety of" stopping a car for a traffic violation); United States v. Harrison,

103 F.3d 986, 989 (D.C. Cir. 1997) (fact that officer observed defendant's car swerve within the

traffic lane provided the articulable suspicion necessary for a traffic stop); United States v.

Montgomery, 561 F.2d 875, 879 (D.C. Cir. 1977) ("The police may stop and question the driver

of a vehicle when an infraction of the motor vehicle code is seen or suspected.").

      13.    Furthermore, even if Officer Omo was mistaken about the classification of the

traffic violation that he witnessed, i.e., whether obstructing traffic is considered a moving

violation as opposed to a parking violation, Omo's decision to stop Defendant was nevertheless

valid because he had reasonable ground to believe that defendant had committed some kind of

traffic offense.  In United States v. Bookhardt, 277 F.3d 558 (D.C. Cir. 2002), for example, a

detective was driving an unmarked car on the freeway when he was forced onto the highway's

shoulder by the defendant's car.  As the detective reentered the road, he observed the defendant's

car traveling at a high speed and weaving in and out of traffic without using turn signals.  Id. at

560.  The detective eventually pulled the defendant over at a stoplight, and, when asked for his

driver's license, the defendant replied that he did not have it with him.  Id.  Upon radioing a

police dispatcher, the detective learned that the defendant's license had expired one month

before.  Id.  Consequently, the detective arrested the defendant for driving with an expired

license, and a search of his car incident to his arrest revealed two guns.  Id.  The defendant was

subsequently charged with weapons-related offenses, and he moved to suppress the guns on the

ground that they were discovered as a result of an unlawful stop.  Id. at 560-61.  Although the

trial court denied the defendant's motion to suppress, it was learned prior to trial that under District of Columbia law, driving with a license expired for more than ninety days was a criminal offense, but doing so for ninety days or less was merely a civil infraction, and thus arrest for such an infraction was not authorized. Id. at 561. After the defendant renewed his motion to suppress, the trial court nevertheless found that the arrest was valid, on the ground that the detective had probable cause to arrest the defendant for reckless driving. Id. In upholding the trial court's determination that the arrest of the defendant was still valid, the District of Columbia Circuit Court of Appeals stated that "[a]s long as [the detective] had an objectively valid ground upon which to arrest [the defendant], the fact that he articulated an invalid one does not render the arrest unlawful." Id. at 566.

14.    Here, by analogy, simply because Officer Omo may have mistakenly designated the offense of "obstructing traffic" a moving violation when, under District of Columbia law, it is classified as a parking violation, does not render his stop of Defendant's vehicle invalid, because the stop was in any event predicated on Defendant's violation of one of the District's traffic offenses. See Bookhardt, 277 F.3d 558, 564 (D.C. Cir. 2002) ("an arrest will be upheld if probable cause exists to support arrest for an offense that is not denominated as the reason for the arrest by the arresting officer") (citing United States v. Joyner, 492 F.2d 655, 656 (D.C. Cir. 1974)); Bell v. United States, 254 F.2d 82, 86 (D.C. Cir. 1958) ("The question is not what name the officer attached to his action; it is whether, in the situation in which he found himself, he had reasonable ground to believe a felony had been committed"); see also Whren, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); United States v. Wesley, 293 F.3d 541, 545 (D.C. Cir. 2002) (probable cause exists when "facts

11

and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person

in believing that the suspect has committed, is committing, or is about to commit an offense").

Therefore, any claim to the contrary is without merit.

>    **B.    The Traffic Stop Was Supported By Reasonable Suspicion of Drug
>          Activity.**

15.     Independent of the fact that Officer Omo had probable cause to initiate a traffic

stop on Defendant's car, he certainly possessed reasonable, articulable suspicion that defendant

had just engaged in a drug transaction, and therefore was entitled to confirm or dispel his

suspicion that something was amiss by effecting a traffic stop of Defendant's car and making

contact with him.  Indeed, it is well settled that the Fourth Amendment does not require a

policeman who lacks the precise level of information necessary for probable cause to arrest to

simply shrug his shoulders and allow a crime to occur or a criminal to escape. Adams v.

Williams, 407 U.S. 143, 145 (1972).  Rather, a police officer may briefly detain a suspect if he

has a reasonable articulable suspicion that criminal activity may be afoot.  Terry v. Ohio, 392

U.S. 1 (1968); United States v. Hensley, 469 U.S. 221, 227-29 (1985).  "Under the Fourth

Amendment ... a policeman who lacks probable cause but whose observations lead him

reasonably to suspect that a particular person has committed, is committing, or is about to

commit a crime, may detain that person briefly in order to investigate the circumstances that

provoke suspicion."  United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975) (internal

quotation marks omitted).

16.     Reasonable suspicion is a "commonsensical proposition" that credits the officer's

special training and practical experience, United States v. Lender, 985 F.2d 151, 154 (4th Cir.

1993), and it is a lesser showing than probable cause. United States v. Perrin, 45 F.3d 869, 872

(4th Cir. 1995), cert. denied 115 S.Ct. 2287 (1995). Even innocent factors considered together

can amount to a reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 9-10 (1989).

17.    In the instant case, the area in which Officer Omo initially observed Defendant

was one previously known by Omo and other officers to have a high incidence of drug trafficking

and drug- and weapons-related arrests. It was against this backdrop that at approximately

midnight Officer Omo observed Defendant pull up and come to a stop in front of an apartment

building, and an unknown male, who did not appear to be appropriately dressed for the cold

weather that night, exited the building and entered Defendant's vehicle. The unknown male then

remained in the car for only about thirty seconds, enough time to consummate a drug deal, then

ran back into the building, and Defendant drove off in his vehicle. Given these circumstances,

Officer Omo reasonably suspected that he had just watched a drug transaction take place between

an occupant inside Defendant's car and the unknown male. Therefore, Omo was entitled to

effectuate a traffic stop and briefly detain Defendant in order to ask questions that could either

alleviate or raise his suspicion that criminal activity was afoot. See Terry, 392 U.S. at 1;

Hensley, 469 U.S. at 227-29. Thus, even if this Court were to find that Officer Omo did not have

probable cause to initiate a traffic stop as a result of having observed Defendant obstruct traffic,

Omo nevertheless had a reasonable suspicion to believe that a crime had been or was being

committed in his presence, and he was entitled to initiate a traffic stop on that independent basis.

18.    Further, once a traffic stop was effected, the officers who came into contact with

Defendant made additional observations that gave rise to additional grounds to believe that the

defendant had engaged in a drug transaction. First, Defendant appeared nervous and fidgety and

constantly broke eye contact with Officer Omo when Defendant initially responded to Omo's

questions.  Second, Defendant's story about going to "a barber shop" seemed highly implausible

given the hour.  Third, Defendant's story to Officer Omo that he had just dropped a friend off

was inconsistent with Omo's own observations that evening.  Fourth, Defendant became even

more agitated when officers asked him to step out of his car, as he began pacing back and forth

while standing outside the car.  And, fifth, when asked repeatedly for permission to search his

car, Defendant neither said yes nor no, but was simply non-responsive.  While each of these

additional factor alone could lend themselves to an innocent explanation, when considered

together with all the circumstances involved here, they provided more than a reasonable basis for

officers to further investigate to determine whether criminal activity had or was taking place.

### C.    The Traffic Stop was Not Extended Impermissibly

19.    Where there is at least articulable and reasonable suspicion that a motorist is

unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is

otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver

in order to check his driver's license and the registration of the automobile is permissible under

the Fourth Amendment.  Delaware v. Prouse, 440 U.S. 648, 663 (1979).  In United States v.

Hutchinson, 408 F.3d 796 (D.C. Cir. 2005), the appellate court held that the retention of an

identification card for the purpose of running a "WALES/NCIC" (Washington Area Law

Enforcement System/National Crime Information Center) records check via computer, thereby

prolonging the Terry investigative stop for an additional two to five minutes, did not violate a

defendant's Fourth Amendment rights.  Likewise, in the instant case, the fact that a brief period

of time elapsed between the time of the initial traffic stop by Officer Omo and the scan by

Finnegan, does not render the temporary detention invalid or unconstitutional.  As the Supreme

Court has held, there is "no rigid time limitation on <u>Terry</u> stops."  <u>United States v. Sharpe</u>, 470

U.S. 675, 685 (1985).  Indeed, crediting the testimony of the officers, it appears that the time

between when Officer Omo initially stopped the defendant at 12:56 p.m., and when Finnegan

gave a final response for the presence of narcotics, was, at most, fourteen minutes.  An end point

of 12:10 a.m. is determined here because Officer Omo testified that Officer Daugherty arrived

shortly after he began writing the citation for obstruction of traffic, and the citation indicates a

time of 12:10 (Tr. (P): 14; <u>see</u> Defense Exh. 3).  In addition, this is consistent with Officer

Daugherty's testimony and the radio run transcript prepared by the defense, that Daugherty

arrived about seven to eight minutes after the dispatcher called for a canine officer at 12:02 a.m.

(Tr. (P): 25).  Also, allowing for the 30 or 40 seconds that Officer Daugherty testified it took to

conduct the scan with Finnegan, the Court finds that the time between the stop of Defendant until

the time police developed probable cause to search his vehicle was no more than fourteen

minutes in this case.

20.    The Court further finds that the there was no inordinate delay of Defendant by

police in waiting until for Officer Daugherty and his dog to arrive.  To the contrary, the testimony

reflects that during the time frame between the stop and the finding of probable cause to search,

Officer Omo asked Defendant for his license and registration, then checked the status of

Defendant's license and performed an NCIC/WALES criminal background check on Defendant;

briefly questioned Defendant about his activities that evening; called for backup and a canine unit

and waited a relatively short period of time for both to arrive; and wrote Defendant's citation.

Also during this time, defendant was talking on his cell phone, and Omo and Delgado asked him

15

to step out of his vehicle and then asked him additional questions, including several requests for permission to search the vehicle. Furthermore, the record here reflects that Officer Daugherty's response time upon receiving the call to appear was expeditious. Indeed, Daugherty testified that once he was notified, he came directly to the location (Tr. (P): 25). Further, although Daugherty also testified that he initially had been given the wrong location, he stated that the incorrect address did not delay his arrival time (Tr. (P): 38-39, 48, 50-52). In any event, the record does not reflect that the police detained the defendant at all solely for the purpose of waiting for Officer Daugherty to arrive, as Officer Omo was still in the process of writing the citation when Officer Daugherty arrived (Tr. (P): 14). So, the time for resolving the traffic stop for obstructing traffic had not actually come to a conclusion. Finally, even if there were some delay here, there is nothing in the record to suggest that such delay was unreasonable. Thus, Defendant's Fourth Amendment rights were not violated here. See Illinios v. Caballes, 543 U.S. 405 (2005) (where a lawful traffic stop was not extended beyond the time necessary to issue a ticket and to conduct ordinary inquiries, another officer's arrival at the scene and the use of a narcotics detection dog to sniff around the exterior of the vehicle did not rise to the level of a cognizable infringement on the Fourth Amendment).

21.    Other Circuits have held, both before and after the Court's decision in Caballes, that reasonable delay times do not invalidate the detention: See, e.g., United States v. Williams, 429 F.3d 767 (8th Cir. 2005) (Traffic stop was not unreasonably prolonged where the wait for the drug sniffing dog was only five to six minutes); United States v. Carpenter, 406 F.3d 915 (7th Cir. 2005) (During lawful traffic stop, arrival of another officer at scene while stop was in progress and use of narcotics detection dog to sniff around exterior of motorist's vehicle did not rise to the

16

level of a cognizable infringement on motorist's rights, such as would have to be supported by some reasonable, articulable suspicion, even if the stop was extended by at most five minutes beyond the time necessary to issue a ticket for evading a red light and to conduct normal inquiries incident to such a stop); United States v. Gregory, 302 F.3d 805 (8th Cir. 2002) (A dog sniff of a car following a traffic stop did not unreasonably extend the length of the detention where there is no evidence that the dog sniff itself was unduly lengthy, and just over twenty minutes elapsed from the beginning of the stop to the completion of the dog sniff); United States v. Lebrun, 261 F.3d 731 (8th Cir. 2001) (Twenty minute detention, based upon reasonable suspicion, following traffic stop while officer awaited arrival of drug dog was not excessive); United States v. Massie, 65 F.3d 843 (5th Cir. 1995) (Detention of vehicle where questioning lasted eight to eleven minutes from time of stop at primary, to the moment the dog alerted to the vehicle at secondary, was reasonable); United States v. Jeffus, 22 F.3d 554 (4th Cir. 1994) (The fifteen minute period prior to the K-9 sniff during the traffic stop was reasonable); United States v. Bloomfield, 40 F.3d 910 (8th Cir. 1994) (The one hour time period between when the officer pulled the defendant over for a traffic violation and when officer arrested defendant was not unreasonable period to wait for drug dog to verify officer's suspicion that vehicle contained drugs); United States v. White, 42 F.3d 457 (8th Cir. 1994) (The detention of one hour and twenty minutes to wait for a drug dog was reasonable where the officer acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available dog); United States v. Hardy, 855 F.2d 753 (11th Cir. 1988) (Trooper acted with dispatch in obtaining trained dog and fifty minute delay did not invalidate the detention, particularly due to the trooper's avoiding any questioning of the defendant during the waiting period). Thus, it is clear that Defendant's rights here were not

infringed by virtue of any brief delay that may have occurred from the time of the stop until the completion of the scan of the vehicle.

      22.    Once Finnegan began the process of alerting to the odor of drugs from outside the vehicle, probable cause developed to search the center console.  United States v. Martin, 422 F.3d 597 (7th Cir. 2005); United States v. Williams, 403 F.3d 1203 (10th Cir. 2005); United States v. Hill, 386 F.3d 855 (8th Cir. 2004); United States v. Moore, 329 F.3d 399 (5th Cir. 2003); United States v. Carter, 300 F.3d 415 (4th Cir. 2002); United States v. Garcia, 205 F.3d 1182 (9th Cir. 2000); United States v. Owens, 167 F.3d 739 (1st Cir. 1999); United States v. Anchondo, 156 F.3d 1043 (10th Cir. 1998); United States v. Seals, 987 F.2d 1102 (5th Cir. 1993); United States v. Colyer, 878 F.2d 469 (D.C. Cir. 1989).  "Probable cause means that there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).

      **C.**    **A Drug Detection Dog Sniff of an Automobile is Not A Search**

      23.    "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Caballes, 543 U.S. at 408 (citing United States v. Jacobsen, 466 U.S. 109, 123 (1984)).  "A dog sniff conducted during a [] lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."  Id. at 410.  In United States v. Place, 462 U.S. 696 (1983), the Supreme Court "treated a canine sniff by a well-trained narcotics-detection dog as 'sui generis' because it 'discloses only the presence or absence of narcotics, a contraband item.'"  Place, 462 U.S. at 707.  "Accordingly, the use of a well-trained narcotics-detection dog – one that does not expose noncontraband items that otherwise would remain hidden from public

18

view during a lawful traffic stop, generally does not implicate legitimate privacy interests."

Caballes, 543 U.S. at 409 (internal citation and quotations omitted).  Just as in Caballes, the sniff

of narcotics by Finnegan here was performed on the exterior of defendant's car while he was

lawfully seized for a traffic violation.  "Any intrusion on [defendant's] privacy expectations does

not rise to the level of a constitutionally cognizable infringement."  Caballes, 543 U.S. at 409.

### D.    Finnegan's First Entrance into the Car Yielded No Contraband

24.    With Finnegan's initial entry into the car, no evidence subject to suppression was

identified, seized, or recovered during Finnegan's initial entry into the car.  In fact, Finnegan did

not alert to the presence of contraband during the first vehicle entry and, accordingly, no police

action was taken in reliance on anything the canine did or did not do.  Moreover, Officer

Daugherty did not direct nor encourage Finnegan to make that initial entry, and once he realized

that the dog had errantly jumped into the car, he quickly pulled the dog out of the car.  Finally,

and perhaps most important, the case of United States v. Stone, 866 F.2d 359 (10th Cir. 1989)

compels the result that Finnegan's first entry into the vehicle did not violate the Fourth

Amendment.

25.    In Stone, the defendant was stopped for speeding, at which time he denied that he

was speeding, and informed the officer that he had been stopped earlier by the police.  The

officer asked to see the prior ticket, and in response, the defendant got out of the car, opened the

rear hatchback and retrieved the ticket.  A few minutes later, another police officer arrived with a

narcotics detection dog.  The dog circled the car, showed interest underneath the rear area of the

car and at the passenger door, and then jumped in the open hatchback, where he alerted on a

duffel bag.  The police then searched the entire car and duffel bag, finding approximately 33,000

19

methaqualone tablets.  The driver was indicted and later filed a pretrial motion to suppress the

narcotics, alleging that both the stop of his car and the subsequent search violated the Fourth

Amendment.  The defendant asserted that he opened the trunk of his car because the officer

insisted on seeing the citation he had received earlier.  Stone, 866 F.2d at 361.

26      The trial court in Stone found "that the dog's leap into the back of the car did not

vitiate the seizure, regardless of whether or not it was a search.  The judge found that the

defendant voluntarily opened the hatchback to retrieve the citation requested by [the] Officer [].

Then the dog came along and 'on his own, apparently jumped into the back of this car and

immediately found what is sought to be suppressed here.'  The judge found that in these

circumstances the search and seizure did not violate the Fourth Amendment."  Stone, 866 F.2d at

362.

27.    The court in Stone indicated that "the dog created a troubling issue under the

Fourth Amendment when it entered the hatchback," but ultimately affirmed the lower court's

decision, and went on to find that "the dog's instinctive actions did not violate the Fourth

Amendment.  There is no evidence, nor does [the defendant] contend, that the police asked [the

defendant] to open the hatchback so the dog could jump in.  Nor is there any evidence that the

police handler encouraged the dog to jump in the car."  Stone, 866 F.2d at 363-64 (emphasis

added).

28.     The same is true here.  Finnegan's instinctive actions when he first jumped in the

car did not violate the Fourth Amendment.  As indicated earlier, no contraband subject to

suppression was found during this first entry, and the dog did not alert or change his behavior in

any way during this first entry.  Like the officer in Stone, there is no indication here that the

20

officer asked the defendant to leave open his car door, and the officer did not encourage the dog

to jump in the car.  Moreover, when the dog did so, the officer acted immediately and

professionally to remove him.  Thus, no Fourth Amendment violation occurred, as no

constitutionally protected privacy interest was impinged upon by the canine's initial entry into

the car.

### E.    The Contraband was Discovered via an Independent Source from Finnegan's Initial Entry

29.    Even if this Court had found that Finnegan's first entry into the defendant's car

was illegal, the evidence seized in this case will not be suppressed because it was discovered

through a source independent of that proffered illegality, i.e., Finnegan's alerting to the narcotics

– while initially outside of the vehicle – during the second exterior sweep.  This was confirmed

by his final response during his second entry into the vehicle, which provided the probable cause

to believe narcotics were in the center console of the car.  This source of probable cause is

wholly independent of the dog's first entry into the car, where nothing appeared to be smelled,

nothing was alerted to, and nothing was seen nor recovered.

30.    The independent source doctrine reflects the idea that although the government

ought not profit from its alleged misconduct, it also should not be made worse off than it would

have been had the alleged misconduct not occurred in the first place.  See e.g., United States v.

Moore, 329 F.3d 399, 404-05 (5th Cir. 2003) (drug evidence obtained during allegedly illegal

arrest admissible because discovery resulted from independent, legal canine sniff test of vehicle);

United States v. Burton, 288 F.3d 91, 100-01 (3rd Cir. 2002) (suppression of evidence not

warranted because police had independent probable cause to search vehicle, irrespective of

alleged unlawful arrest); <u>United States v. Veillette</u>, 778 F.2d 899, 903-04 (1st Cir. 1985)

(evidence admissible because search warrant application contained sufficient independent

evidence to support probable cause); <u>See</u> <u>generally</u> <u>Murray v. United States</u>, 487 U.S. 533

(1988); <u>Nix v. Williams</u>, 467 U.S. 431 (1984).  Thus, any proffered illegality to the canine's first

entry into Defendant's vehicle is of no moment, as all of the contraband was discovered only as a

result of the independent, second external sniff of the vehicle and the attendant alert to narcotics

odor as a consequence of that second external sniff.

Respectfully submitted,

JEFFREY A. TAYLOR (D.C. Bar No. 498610)
United States Attorney

By:    _____
MICHAEL T. TRUSCOTT (New York Bar)
Assistant United States Attorney
Federal Major Crimes Section
United States Attorney's Office
555 Fourth Street, N.W., Room 4237
Washington, D.C. 20530
(202) 514-7533
(202) 514-6010 (fax)
michael.truscott2@usdoj.gov

By:    _____
DONNELL W. TURNER (Maryland Bar)
Assistant United States Attorney
Federal Major Crimes Section
United States Attorney's Office
555 Fourth Street, N.W., Room 4235
Washington, D.C. 20530
(202) 305-1419
(202) 514-6010 (fax)
www.donnell.turner2@usdoj.gov