# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                               )
**UNITED STATES OF AMERICA ,**          )
                                               )
        **v.**                                )     **Crim. No. 06-032 (HHK)**
                                               )
**GEORGE MCKOY,**                        )
                                               )
            **Defendant.**                   )
_____)

**DEFENDANT GEORGE MCKOY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO THE NOVEMBER 18, 2006 HEARING ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED IN VIOLATION OF THE UNITED STATES CONSTITUTION**

On November 18, 2006, the Court held an evidentiary hearing in connection with Defendant George McKoy's Motion to Suppress Evidence Seized In Violation Of The United States Constitution.  Following the hearing, the Court ordered the parties to supply the Court with proposed findings of fact and conclusions of law.  In accordance with the Court's instructions, defendant, through undersigned counsel, respectfully submits the below proposed findings of fact and conclusions of law.  Based on the evidence adduced at the hearing and the relevant legal authorities, defendant respectfully submits that the evidence in this case must be suppressed, as it was obtained in clear violation of Mr. McKoy's constitutional rights.

## PROPOSED FINDINGS OF FACT

A.      **Testimony of United States Park Police Officer Jason Omo.**

The first officer called at the suppression hearing was United States Park Police Officer Jason Omo.  Officer Omo has now been with the Park Police for approximately four years.  Tr. at

5.[1]  On the night of January 3, 2006, Officer Omo was traveling alone in a fully marked patrol

cruiser.  Id. at 6.  Officer Omo conducted a "traffic stop" at 35th and A Streets, SE.  Id. at 6.

Officer Omo conducted the stop on a green Jaguar which Mr. McKoy was driving.  Id.

Officer Omo had first observed the green Jaguar at a different location from where the

stop occurred.  According to the officer's testimony, he first observed the vehicle near the

location of Dubois and 34th Streets, in front of 316 34th Street, SE.  Id. at 8.  When the green

Jaguar pulled up at the location, Mr. McKoy "parked next to a parked car, parked along the

curb."  Id. at 8.  Mr. McKoy's car was "adjacent to a parked vehicle," "parked abreast of [the]

parked car."  Id. at 31.

The way Mr. McKoy's vehicle was parked, "cars could still proceed" around it.  Id. at 32.

Other cars could still get where they were going "[u]nless they were trying to get [to the exact

spot] where the green jaguar was parked."  Id. at 33.  Officer Omo testified that Defense Exhibit

1, a photograph showing a Volkswagon ("VW") parked in front of 316 34th Street, SE, was

"very close" to what he had seen, id. at 35, and that the VW was in approximately the same place

Mr. McKoy's had been on the night of January 3, 2006.  Id. at 35; see also Ex. 1 (Def. Ex. 1 -

photograph of VW parked in front of 316 34th Street).

While Mr. McKoy was parked in front of 316 34th Street, Officer Omo "saw him sit there

for about a second, and then I saw an individual run out of the apartment complex adjacent to

where he had stopped, get in his vehicle, remain in there for a few seconds, and then [the

---

[1]      As used herein, "Tr." refers to the transcript from the morning session of the
November 16 hearing.  "Tr. II" refers to the transcript from the afternoon session.

unknown individual] got back out." Id. at 8.[2]  Officer Omo testified that he witnessed this

observation while stopped at a red light at the intersection of Eli and Minnesota Avenues.  Id. at

11 ("During this entire observation, I was at a red light on Eli at Minnesota."); see also id. at 30

("Your entire observation of Mr. McKoy in front of 316 34th Street occurred while you were

stopped at that red light, correct?  A: That's correct.").

     Once Mr. McKoy drove away from 316 34th Street, Officer Omo "tracked" him for

approximately 4.5 blocks.  After tracking Mr. McKoy for that distance without operating his

emergency equipment, Officer Omo activated his emergency lights and pulled Mr. McKoy over

at 35th and A Streets, S.E.  Id. at 41.  At 11:55 p.m., Officer Omo called dispatch and checked

the green Jaguar's license plate.  Id. at 51.  The dispatcher performed the requested check and

reported that the vehicle's tags were valid.  Id. at 42.

     Officer Omo then approached Mr. McKoy's vehicle and requested his license and

registration.  Id. at 42.  Mr. McKoy already had those items in his hand and passed them to

Officer Omo.  Id. at 42-43.  Officer Omo also asked Mr. McKoy to shut off his vehicle and to

give Officer Omo the keys.  Id. at 43.  Mr. McKoy complied with all of Officer Omo's

instructions.  Id.  Officer Omo testified that he advised Mr. McKoy during the stop that "this was

a high drug area," and that he "was stopping him to let him know that citizens don't really

appreciate vehicles and people being–hanging out there and being parked there."  Id. at 16.

Officer Omo testified that Mr. McKoy seemed nervous when speaking with him.  Id. at 15.

---

[2]    Officer Omo later testified that the individual stayed in Mr. McKoy's vehicle "less
than 30 seconds," and "around 30 seconds."  Id. at 11.  He admitted, however, that at the
preliminary hearing in this case, which was held on January 9, 2006, five days after the arrest, he
characterized the individual as being in Mr. McKoy's vehicle for "15 to 20 seconds."  Ex. 2
(pages from preliminary hearing transcript).

Officer Omo returned to his patrol vehicle and ran a check of Mr. McKoy's driver's license and registration. The check was performed at 11:59 p.m. Id. at 46. Mr. McKoy's driver's license and the registration for the green Jaguar were both valid. Id. at 21. Officer Omo then ran checks of Mr. McKoy for any outstanding warrants through two separate systems: the WALES system and the NCIC system. Id. at 22. After a minute or two, Officer Omo received information from both systems that there were no outstanding warrants for Mr. McKoy. Id.

* * *

Following all of the above, sometime after 12:01 a.m., Officer Omo requested a drug dog to inspect the exterior of Mr. McKoy's vehicle. Id. at 69. To recap, prior to the time that Officer Omo **even requested** a drug dog, it is undisputed that Officer Omo had already done all the following, at a minimum: (1) conducted a traffic stop of Mr. McKoy's vehicle; (2) conducted a check of the vehicle's license plate; (3) approached the vehicle; (4) made various comments to Mr. McKoy concerning the neighborhood; (5) retrieved Mr. McKoy's license and registration; (6) ordered Mr. McKoy to shut off the car and hand him the keys; (7) returned to his patrol car; (8) checked Mr. McKoy's license and registration; (9) received information back that the license and registration were valid and clear; (10) checked for outstanding warrants for Mr. McKoy through NCIC and the WALES system; and (11) received a report back that there were no outstanding warrants for Mr. McKoy.

After requesting the drug dog, but before the canine officer (Officer Daughtery) arrived on the scene, another Park Police Officer, Officer Delgado, arrived. Together, Officers Omo and

4

Delgado continued to question Mr. McKoy.[3]  Id. at 23.  They also ordered Mr. McKoy out of his

vehicle.  Id. at 45.  Pursuant to Officer Omo's command, Mr. McKoy opened the door and

stepped out of the vehicle.  Id.  After Mr. McKoy stepped out of the vehicle pursuant to Officer

Omo's command, the driver's door of the vehicle remained open.  Id. at 46.  Officer Omo did not

tell Mr. McKoy to shut the door.  Id.  Officer Omo also did not shut the door.  Id.

At 12:07 a.m., Officer Daughtery, the responding K-9 Officer, radioed that he had the

wrong location for the traffic stop.  Instead of 35th and A Streets, Officer Daughtery was at 35th

and D Streets.  Id. at 69.  Officer Omo testified that Officer Daughtery arrived on the scene at

approximately 12:12 pm, which was over 15 minutes after Officer Omo initiated the traffic stop

at 11:56 p.m.[4]  Id. at 24.

Following the conclusion of the drug search by the drug detection K-9, Officer Omo

issued Mr. McKoy a citation for "obstructing traffic," based on what he had allegedly seen at 316

34th Street.  Id. at 26; see also Ex. 4 (Def. Ex. 4 - Notice of Infraction).  The ticket states that it is

for a "moving violation" for "obstructing traffic."  See id.  The fine on the ticket is for $15.[5]  See

---

[3]        Officer Omo testified that Mr. McKoy told the officers he was headed to get a
haircut.  Officer Delgado, however, testified (and it seems more likely) that Mr. McKoy said he
was headed to a barbershop, but that he did not mention getting a haircut.  See Tr. II at 65, 81-82.

[4]        At a separate point in his testimony, Officer Omo testified that it was "about nine
minutes."  Tr. at 19.  His testimony on page 24 that it was 15 minutes was less confusing and
based specifically on the times that the traffic stop was conducted and that Officer Daughtery
arrived on the scene.  See id. at 24.  It also comports with Officer Daughtery's testimony and the
"radio run" communications.  See Ex. 3 (Defense Tr. of Radio Run).  It therefore appears far
more reliable than his initial estimate, where there was confusion between Officer Delgado (who
arrived prior to Officer Daughtery) and Officer Daughtery.

[5]        Officer Omo had initially testified that what he had seen at 316 34th Street was
"double parking," and acknowledged that double parking is a parking infraction–not a moving
violation.  Tr. at 72; see also id. at 9 (Officer Omo testifying that he had heard of the term

id.

Officer Omo was then shown the Table of Contents from the Moving Violations section of the District of Columbia Municipal Regulations ("D.C.M.R.").  After examining the D.C.M.R. provisions, Officer Omo testified that "obstructing traffic" was not among the moving violations listed in the D.C.M.R., which it is not.  Id. at 77.  Officer Omo then appeared to admit that there is no violation called obstructing traffic, which there is not.  Id. 77-78.

Officer Omo testified that he had served parking tickets in the past.  Id. at 79.  Unlike tickets for moving violations, a parking ticket can simply be affixed to the windshield of someone's car.  Id. at 80.  There is no need to obtain biographical information or similar information, because the ticket is in fact issued to the car, and not to the driver.  Id. at 80.  It does not take much time to issue a parking ticket.  Id.  The issuing officer must only complete a few requests for information on the ticket.  Id.

On re-direct examination, the government asked Officer Omo about the nature of the alleged "traffic violation" in this case.  Id. at 86.  The government approached Officer Omo and questioned him concerning the Notice of Infraction issued to Mr. McKoy, see Ex. 4 (Def. Ex. 4 - Notice of Infraction), which listed the offense as "obstructing traffic."  Id. at 84.  Officer Omo

---

"double parking" and that "that's what [the defendant] did").  Officer Omo could not, however, explain the requirements of the double parking law.  See Tr. at 78.  He also subsequently testified that what he had seen was not double parking, or any other kind of parking infraction.  See Tr. at 72 ("Q:  So what you had seen was a parking infraction, correct?  A.:  No").

In fact, the double parking regulation permits the way Mr. McKoy was allegedly parked in front of 316 34th Street, as it permits "a passenger vehicle [to] stand parallel and as near as practicable to other parked vehicles, only long enough to take on passengers who are actually waiting at the curb or to leave off passengers."  D.C.M.R. § 2401.1; see also id. §§ 2401.2, 2401.3 (loading and unloading).  Ultimately, Officer Omo testified that the violation was of D.C.M.R. § 2501.1(a), which is a parking violation for parking in an intersection, and not double parking.  See discussion, infra.

then testified that at the time of the offense he believed he had seen a "moving violation." Id. at

85.  Next, the following exchange occurred:

> Q: [by government]:    Officer Omo, today do you still believe that the defendant
> committed a moving violation of a parking violation?
>
> THE WITNESS:    Quite honestly, I'm not sure right now.

Id. at 86.

The government then led Officer Omo into a discussion of D.C.M.R. § 2405.1(a), which

is a non-moving violation (i.e., a parking violation) concerned with stopping a motor vehicle at

an intersection.[6]  Id. at 92.  Officer Omo testified that he was familiar with the regulation.  Id. at

92.  He also stated that this parking regulation was what he believed he was referring to when he

issued defendant a ticket for "obstructing traffic," even though Officer Omo characterized the

offense as a "moving violation" on the Notice of Infraction.  Tr. II at 15; see also Ex. 4 (Def. Ex.

4 - Notice of Infraction).  Furthermore, the fine for a violation of D.C.M.R. § 2405.1(a) is

$50–not the $15 written on the Notice of Infraction that Officer Omo issued to Mr. McKoy.  See

D.C.M.R. § 2601.1 (1995) (listing fines for various traffic offenses).[7]

---

[6]    D.C.M.R. § 2405.1 is a **non-moving** violation (i.e., a parking violation) entitled
"Stopping, Standing, or Parking Prohibited: No Sign Required."  That regulation states in
relevant part:

> No person shall stop, stand or park a vehicle in any of the following places, except
> when necessary to avoid conflict with other traffic, in compliance with law, or at
> the direction of a police officer or traffic control device:
>
> (a)    Within an intersection[.]

D.C.M.R. § 2405.1(a).

[7]    All relevant D.C.M.R. provisions are included at Exhibit 5.

7

On re-cross examination, Officer Omo was shown photographs of the VW parked in front of 316 34th Street, which he had previously testified was in approximately the same place as Mr. McKoy's vehicle had been on the night of January 3, 2006.  See discussion, supra; see also Ex. 1 (Def. Ex. 1 - photo of VW in front of 316 34th Street).  After looking at the photographs, Officer Omo acknowledged the plain fact that a vehicle parked in front of 316 34th Street–as Mr. McKoy's was–is **not** in the intersection of 34th and Dubois Streets.  See Tr. II at 12 ("Q: And the vehicles there do not appear to be in the intersection of 34th and Dubois, correct?"  A: Yes.").  A viewing of Defense Exhibit 7 from the Suppression Hearing (or any number of other defense exhibits, see, e.g., Def. Exhibits 6, 7, 11, and/or 12) confirms this same critical fact:  vehicles parked in front of 316 34th Street are not in the T-intersection of 34th and Dubois Streets.  See id.; see also Ex. 6 (containing Def. Hrg. Exs. 5, 7, 10, 11 and 12 (additional defense photos admitted at hearing)).  Thus, Mr. McKoy's vehicle could not possibly have been parked in violation of D.C.M.R. § 2405.1.

**B.    Testimony of United States Park Police K-9 Officer Jeff Daughtery.**

The government's next witness was U.S. Park Police K-9 Officer Jeff Daughtery.  The United States Park Police does not have its own certification process for drug detection K-9s. Officer Daughtery testified that he and his drug detection K-9, K-9 "Finnegan," are certified through the U.S. Police K-9 Association.  Officer Daughtery testified that Finnegan's reliability in terms of detecting narcotics is above 80%.  Tr. II at 22.  When pressed by the government, Officer Daughtery said it could "possibly" be as high as 90%.  Id. at 22 ("Q: Would it be – would it be more than 80 percent, say, 90 percent?  A: Possibly, yes.").

Officer Daughtery testified that he received the call for a drug dog at approximately 12:02

a.m. Id. at 24. Officer Daughtery estimated that he arrived at 35th and A Streets approximately

seven or eight minutes later. Id. at 24. From the "radio run," Officer Daughtery could tell that he

was not on the scene at 12:07 a.m., because he was still searching for the correct location at that

time. Id. at 39. Thus, he must have arrived at the scene at some time after that; Officer

Daughtery estimated it was a couple of minutes after that. Id. at 39 and 52. That is consistent

with the radio run and Officer Omo's testimony, which showed that Officer Daughtery arrived

approximately 15 minutes after Officer Omo initiated the traffic stop. See, e.g., Ex. 3 (Defense

Transcript of Radio Run). Officers Omo and Delgado were already on the scene by the time

Officer Daughtery got there. Id. at 26.

Upon arriving at the scene, Officer Omo requested that Officer Daughtery run an exterior

scan of the vehicle. Id. at 28. Prior to running the scan, Officer Daughtery observed that the

driver's door of the green Jaguar was open, from when Officer Omo had ordered Mr. McKoy out

of the vehicle. Id. Office Daughtery removed K-9 Finnegan from the vehicle and began the

search. He started at the front of Mr. McKoy's vehicle and directed the dog in a

counterclockwise direction. Id. at 29. The dog was on a leash, id. at 39, which gives Officer

Daughtery control over the dog. Id. at 39-40. The leash is six feet long, but Officer Daughtery

chokes up on the leash by a couple of feet to "keep it short." Id. at 47-48.

As Officer Daughtery and Finnegan passed by the driver's side door, Finnegan jumped

into Mr. McKoy's vehicle. Id. Officer Daughtery them removed Finnegan from the vehicle and

continued the exterior scan. Id. As Officer Daughtery continued around the vehicle, Finnegan

started sniffing in the area by the left taillight, but "he did not stay with that area." Finnegan

"continued on" with Officer Daughtery to continue the exterior scan. Id. at 31. The dog's

sniffing at the left taillight told Officer Daughtery that "this part of the car is more interesting" to

the dog, but "because of the fact I was able to get him to leave that area," all the behaviors which

constitute an alert for narcotics "were not present." Id. at 41. As Officer Daughtery testified:

> An alert is a set of behaviors that you observe in your dog that he exhibits when
> he's in the odor of a substance he's trained to detect . . . I find his alert to be all
> the behaviors together. The initial, the closing of the mouth, the intense sniffing
> that – usually, the dog will – you know will pass by and if – especially if he's
> passing by, his nose almost bring him back to the spot. He'll realize that, 'Hey,
> this is an odor I recognize.' If you take him back, he stays there. I always try to
> continue moving, because you can induce your dog to possibly think, 'Hey, there
> must be something there,' so I always keep him moving, because he didn't stay in
> the area as long as, you know – and he also did not give me his final response,
> which is just sitting.

Id. at 33. Officer Daughtery then completed a full loop around Mr. McKoy's vehicle.

Once Officer Daughtery had completed the first loop, he reversed direction and started a

slower, more detailed scan going in a clockwise direction this time. Id. at 31. On this second

pass, when Officer Daughtery and Finnegan passed the passenger side door–which was

closed–Finnegan did not sniff in that area. Id. at 42. Finnegan again sniffed in the "left rear

portion of the trunk taillight area," but as before he continued onward with Officer Daughtery

and did not alert for the presence of narcotics. Id.

On this second search, as Office Daughtery and Finnegan passed by the driver's door

again–which the officers had not closed after the first entry, and therefore was still

open–Finnegan "jumped in the vehicle again." Id. at 34. This time, Finnegan had turned his

head and sniffed through the open door, "and then he jumped in the vehicle right away." Id.

After jumping through the open door, Finnegan "went immediately to the center console area,

and then he sniffed it." Id. Finnegan then jumped over the console and into the passenger seat,

turned to face Officer Daughtery, put his nose back on the center console and then looked at

Officer Daughtery and sat.  Officer Daughtery testified that that set of behaviors was Finnegan's

alert to the presence of narcotics.  Id. at 34.

In terms of the general process of how drug K-9 detects narcotics, Officer Daughtery

testified that the more time the dog has to sniff an odor, the more likely the dog will be able to

determine whether or not he smells narcotics.  Id. at 46.  Thus, it is possible that Finnegan's first

entry into the vehicle contributed to his alert when he entered the car for a second time.

## C.      Testimony of United States Park Police Officer Eduardo Delgado.

The government's third and final witness was United States Park Police Officer Eduardo

Delgado.  Officer Delgado arrived approximately 5-7 minutes from the time he received a cell

phone call from Officer Omo.  Id. at 56.  He was the first officer to arrive on the scene besides

Officer Omo.  Id.  When he arrived on the scene, he and Officer Omo "approached the vehicle

together."  Id. at 58.  Officer Delgado testified that when they approached the vehicle, Mr.

McKoy was on his cellular telephone, which Mr. McKoy then hung up.  Id.  Officer Delgado

testified that when Mr. McKoy's cell phone rang again subsequently, Mr. McKoy picked it up.

Officer Omo asked him to hang it up, at which time Mr. McKoy told Officer Omo it was his

mother and she wanted to speak with him.  Officer Omo said he would not speak with her, and

Mr. McKoy hung up the phone.  Id.

Officer Delgado testified that because of the cell phone conversations, the officers asked

Mr. McKoy to step out of the vehicle.  Mr. McKoy did so.  The officers then asked him to step to

the front of the vehicle.  Officer Delgado testified that this happened "a little past after one in the

morning."  Id. at 65.  The officers asked Mr. McKoy at least three times whether they could

11

search his car.  Id. at 67.  Officer Delgado testified that Mr. McKoy seemed "nervous," because

he was "breaking eye contact" with him and "looking down."  Id. at 64-65.  Mr. McKoy

informed the officers that he was just trying to get to the barber shop.[8]  Id. at 65.

* * *

Following K-9 Finnegan's alert for the presence of narcotics while sitting in Mr.

McKoy's vehicle, the officers searched the vehicle and recovered narcotics in the center console

and in a backpack in the trunk of the vehicle.  Tr. at 25.

## PROPOSED CONCLUSIONS OF LAW

**I.    All Evidence Must Be Suppressed Because the Initial Traffic Stop of Mr. McKoy Was Objectively Unreasonable As There Was No Violation Of Any Kind.**

In determining the reasonableness of a traffic stop, this Court must apply an objective

standard.  See United States v. Hill, 131 F.3d 1056 (D.C. Cir. 1997).  It is plain from the hearing

conducted in this matter that Mr. McKoy committed neither a moving violation nor a parking

violation on the evening of January 3, 2006.  Since there was no objectively reasonable basis for

stopping Mr. McKoy's vehicle, all evidence must be suppressed.

**A.    There Was No Moving Violation.**

It is beyond peradventure at this point that Mr. McKoy did not commit a moving

violation on the night of January 3, 2006, as Officer Omo originally claimed in issuing the ticket

to Mr. McKoy.  Even though the ticket assets that Mr. McKoy committed the "moving violation"

of "obstructing traffic" with a fine of $15, **not one** of these assertions on the ticket survives

scrutiny when compared to the D.C.M.R., which contains all of the District of Columbia's traffic

_____

[8]        See discussion, note 3, supra.

regulations.  Officer Omo could not explain any of the key differences between the ticket and the

D.C.M.R.  Simply put, Officer Omo stopped and ticketed Mr. McKoy for an offense that does

not exist.  On this basis alone, all evidence in this case must be suppressed.  See Indianapolis v.

Edmond, 531 U.S. 32, 42 (2000); United States v. Bullock, 215 F. Supp. 2d 1764 (D.D.C. 2002).

**B.    There Was No Violation Of Parking Regulation D.C.M.R. § 2405.1.**

After extensive questioning, and not until his re-direct examination at the suppression

hearing, Officer Omo eventually testified that the offense in this case was a violation of

D.C.M.R. § 2405.1(a).  Defendant respectfully submits that D.C.M.R. § 2405.1(a) was not

mentioned or even alluded to during Officer Omo's direct testimony–or in the Government's

Opposition to Defendant's Motion to Suppress.  See Gov. Opp. at 1 ("[the] officer . . . initiated a

traffic stop for obstructing traffic on a 2003 Jaguar driven by the defendant").  Indeed, Officer

Omo expressly testified that what he had seen was not a parking violation.  See Tr. at 72 ("Q:  So

what you had seen was a parking infraction, correct?  A.:  No").  Respectfully, this contradictory

testimony completely undermines the credibility of the government's position on this critical

issue.

Furthermore, Officer Omo's testimony was very uncertain as to the nature of the alleged

violation in this case.  See Tr. at 86 ("Q: Officer Omo, today do you still believe that the

defendant committed a moving violation of a parking violation?  A: Quite honestly, I'm not sure

right now").  In the absence of more definitive testimony, the government cannot be found to

have carried its burden of establishing the constitutionality of the traffic stop in this case.

Respectfully, the Court should also consider that the government's newfound assertion

that Mr. McKoy violated D.C.M.R. § 2405.1(a) is at odds in key respects with the parking ticket

Officer Omo issued to Mr. McKoy.  As noted above, that ticket describes the offense as "obstructing traffic," which is listed as a moving violation with a fine of $15.  D.C.M.R. § 2405.1 is a parking violation–and not a moving violation, as set forth on the ticket.  And finally, the amount of the fine for a violation of D.C.M.R. § 2405.1 is $50–not the $15 written on the ticket.  <u>Compare</u> Ex. 4 (Notice of Infraction listing offense as a moving violation with a fine of $15) <u>with</u> D.C.M.R. § 2405.1 (establishing parking infraction with a fine of $50).

Finally, even accepting that Officer Omo believed he saw a violation of the parking regulation D.C.M.R. § 2405.1(a), the record conclusively demonstrates that no such violation occurred.  As noted, D.C.M.R. § 2405.1 is a parking violation entitled "Stopping, Standing, or Parking Prohibited: No Sign Required."  The regulation states in relevant part:

> No person shall stop, stand or park a vehicle in any of the following places, except when necessary to avoid conflict with other traffic, in compliance with law, or at the direction of a police officer or traffic control device:

> (a)      Within an intersection[.]

This civil parking offense carries a fine of $50.

In the first instance, given the language of this parking regulation and its clear purpose, the government's assertion that D.C.M.R. § 2405.1(a) should apply to a "T-Intersection" of the kind at 34th and Dubois Streets makes no sense.  The obvious purpose of D.C.M.R. § 2405.1(a) is to ensure that traffic can proceed smoothly through an intersection.  That purpose is in no way advanced by application to a car that is stopped at the base of a T-intersection, as, by definition, cars do not proceed <u>through</u> a T-intersection.  And, as was clear from Officer Omo's testimony, Mr. McKoy's vehicle was not stopping any other vehicles from getting where they were going.  <u>See</u> Tr. at 32-33.

14

Second, even if the Court were to apply D.C.M.R. § 2405.1 to a T-Intersection such as 34th and Dubois, the record conclusively demonstrates as a factual matter that <u>Mr. McKoy was not parked in the intersection of 34th and Dubois</u>. A review of defendant's exhibits demonstrates that a car stopped in front of 316 34th Street–where it is undisputed that Mr. McKoy was stopped–is not in the intersection. Defense Exhibit 7 from the hearing (attached hereto as Exhibit 5) shows plainly that a car parked in front of 316 34th Street, as Mr. McKoy's was, is not in the intersection. <u>See</u> Ex. 5 (containing Def. Hrg. Ex. 7 as well as various other photographs admitted into evidence at hearing). Indeed, Officer Omo agreed that the VW in defendant's photos–which he had previously testified was in approximately the same place as Mr. McKoy's car had been–was not in the intersection at 34th and Dubois Streets. <u>See</u> Tr. II at 12 ("Q: And the vehicles there do not appear to be in the intersection of 34th and Dubois, correct?" A: Yes.").

Thus, Officer Omo's stop of Mr. McKoy in this case was objectively unreasonable, because Officer Omo had no reasonable basis for believing that Mr. McKoy had committed a traffic offense or any other kind of offense. As a result, the fruits of that stop, <u>i.e.</u>, the crack cocaine and money allegedly seized from defendant's vehicle and his person, must be suppressed. <u>See</u> <u>Edmond</u>, 531 U.S. at 42; <u>Bullock</u>, 215 F. Supp. 2d 1764.

## II. Assuming *Arguendo* That Defendant Committed A Violation Of D.C.M.R. § 2405.1 By Parking In An "Intersection," Officer Omo Was Not Constitutionally Permitted To Stop Mr. McKoy For An Antecedent Civil Parking Violation.

Even assuming that Mr. McKoy committed a violation of D.C.M.R. § 2405.1–which he clearly did not–reasonable suspicion of a civil law parking violation did not provide Officer Omo with reasonable suspicion of a **criminal** violation necessary to conduct the traffic stop. While there are no federal cases directly on point, a case from the Minnesota Supreme Court, <u>State v.</u>

15

Holmes, 569 N.W.2d 181, 185 (Minn. 1997), is.  The Holmes case addresses precisely the

situation at issue here:  whether a police officer can stop a defendant based on reasonable

suspicion of a parking violation only.  In answering this question, the Holmes court observed:

> It is essential to remember that Terry authorizes a police officer to temporarily
> seize a person on less than probable cause.  As a protective measure, the Supreme
> Court necessarily has limited such seizures to those situations where the suspected
> violation is serious.  As a result, we hold that a police officer who merely has
> reasonable suspicion that a parking violation has occurred cannot seize an
> individual for the purpose of enforcing the known violation.

Id. at 185.  As a result, the court held that "[a]lthough there has been much debate over what

types of violations are serious enough to merit a Terry stop, there can be no debate that a parking

violation is not one of them."  Id.

The D.C. Circuit case United States v. Brookhardt, 277 F.3d 558 (D.C. Cir. 2002), is also

very instructive on this issue.[9]  In Brookhardt, a police officer saw the defendant driving

recklessly in the highway and pulled him over.  Once he pulled the defendant over, the officer

asked for the defendant's license, which was expired.  Based on the expired license, the police

officer arrested the defendant, and found a gun during the search incident to arrest.

As the defendant's license in Brookhardt had been suspended for less than 90 days, the

court found that the offense was civil only, and not criminal.  See id. at 564 ("As the government

concedes, although [the officer] arrested Brookhardt for driving with an expired license, he did

---

[9]    In terms of federal cases, United States v. Copeland, 321 F.3d 582 (6th Cir. 2003),
though somewhat similar, is distinguishable, as in that case the officers testified that they
intended to stop the defendants in order to issue the driver a parking citation, but the defendant
pulled away before they could do so.  Id. at 591.  Here, Officer Omo remained at the red light at
Eli and Minnesota Avenues for the entire time that Mr. McKoy was parked in front of 316 34th
Street, SE.  There was nothing preventing Officer Omo from ticketing Mr. McKoy when he first
observed the alleged parking infraction.

not have probable cause to do so because it is not a crime under the District of Columbia law to drive with a license that has been expired for ninety days or less"). The D.C. Circuit observed that the defendant could not have been arrested based on a civil law violation, see id., as a Terry stop or any other kind of official detention must be based on "a reasonable, articulable suspicion that 'criminal activity may be afoot.'" United States v. Broadie, 452 F.3d 875, 879 (D.C. Cir. 2006) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968) (emphasis added)). Here, similarly, suspicion of a violation of parking regulation D.C.M.R. § 2405.1(a)–which is only a civil law violation–did not give Officer Omo the reasonable suspicion of a criminal law violation necessary to effectuate a stop of Mr. McKoy.

**III.    Officer Omo's Actions During A Traffic Stop Based On A Parking Violation Far Exceeded Constitutional Limitations.**

Even assuming that Officer Omo lawfully stopped Mr. McKoy, his actions during the traffic stop far exceeded constitutional limitations–particularly for a traffic stop based on an alleged parking infraction. As stated in Terry, "the scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." Terry, 392 U.S. at 19. Thus, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983) (emphasis added); see also United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975) (holding that "reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop"); United States v. Hutchinson, 408 F.3d 796, 799 (D.C. Cir. 2005) ("the permissible scope and duration of a Terry stop necessarily varies with the circumstances in each case") (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)).

Here, the government now claims that the purpose of the traffic stop was to issue a **parking ticket.** Officer Omo testified that it takes very little time to issue a parking ticket, as there are just a few requests for information on the ticket. <u>See</u> Tr. at 79-80. Moreover, Officer Omo testified that contact with the driver of the car is not even necessary at all; the ticket can simply be handed to the driver or affixed to the windshield of the car, as the ticket is actually against the car, and not the driver. <u>Id.</u>

Under the circumstances of issuing a parking ticket, Officer Omo had minimal discretion under <u>Terry</u> in terms of conducting the stop (indeed, Officer Omo was not permitted to stop Mr. McKoy at all, <u>see</u> discussion, <u>supra</u>). Thus, Officer Omo's actions during the stop –such as taking Mr. McKoy's license and registration, seizing his keys from him, ordering him out of the car, and detaining him for over 15 minutes so he could obtain the services of a drug-sniffing dog–clearly "last[ed] longer than [was] necessary to effectuate the purpose of the stop." <u>Florida v. Royer</u>, 460 U.S. at 500. Accordingly, all evidence uncovered during the unconstitutional search must be suppressed on that basis, as well.

**IV.    All Evidence Must Be Suppressed Because The Park Police Officers Unconstitutionally Prolonged Defendant's Seizure In Violation Of The Fourth Amendment.**

In the recent Supreme Court case <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005), the Supreme upheld the use of a drug-sniffing dog to search the exterior of a vehicle that was the subject of a lawful traffic stop. The <u>Caballes</u> Court was very clear, however, that law enforcement was not constitutionally permitted to extend a traffic stop for a K-9 sniff in the absence of reasonable suspicion or probable cause for doing so. The Court specifically stated that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it

18

is prolonged beyond the time reasonably required to complete that mission." Id. at 407.  In

Ceballes, which involved a speeding ticket, an exterior scan of defendant's vehicle, discovery of

contraband, and an arrest, "[t]he entire incident lasted less than 10 minutes." Id. at 406.

Indeed, the Caballes Court expressly distinguished the situation it confronted from People

v. Cox, 202 Ill. 2d 462, 782 N.E. 2d 275 (2002), an earlier case from the Illinois Supreme Court

"involving a dog sniff that occurred during an unreasonably prolonged traffic stop." Caballes,

543 U.S. at 407.  In Cox, the Illinois Supreme Court upheld the suppression of evidence seized

from a vehicle because the police officers had prolonged the traffic stop beyond the time

necessary to issue the ticket.  The Caballes Court stated that "[w]e may assume that a similar

result would be warranted in this case if the dog sniff has been conducted while respondent was

being unlawfully detained." Id. at 408.  As noted, in Caballes, which involved a speeding

ticket–as opposed to an alleged parking infraction–the authorized length of the stop was for ten

minutes. Id. at 406.

Assuming *arguendo* that there was a lawful traffic stop in this case–which there was

not–the Park Police officers' use of a drug-sniffing dog in this case still violated the Fourth

Amendment, as the stop was "unreasonably prolonged" in violation of Mr. McKoy's Fourth

Amendment rights.  The record conclusively establishes that at least 15 minutes had elapsed

between the time that Officer Omo stopped Mr. McKoy and the time K-9 Officer Daughtery

appeared on the scene; at least another minute or two passed while the dog searched Mr.

McKoy's car.  Thus, the duration of the stop was far longer than the 10 minutes the Supreme

Court stated was permissible in Caballes.  Moreover, unlike Caballes, which involved a speeding

ticket, this stop involved a mere alleged parking infraction.  There is no question here that the

traffic stop was prolonged beyond the time necessary to write a parking ticket, so that Officer

Omo could obtain the services of a drug-sniffing dog.[10]  The stop therefore exceeded the rules set

down by the Supreme Court in Caballes and was conducted in violation of defendant's Fourth

Amendment rights.  The evidence accordingly must be suppressed.

**V.     All Evidence Must Be Suppressed Because the Park Police Officers Exceeded Their Constitutional Authority In Permitting The Drug-Sniffing Dog To Enter Defendant's Car In The Absence of Reasonable Suspicion.**

The evidence also must also be suppressed as a fruit of the unlawful warrantless invasion

of Mr. McKoy's vehicle by the drug-sniffing K-9.  In Caballes, the Supreme Court authorized a

warrantless inspection of **"the exterior** of respondent's car while he was lawfully seized for a

traffic violation."  543 U.S. at 409 (emphasis added).  As the defendant in Caballes was already

detained on a traffic stop and the K-9 did not actually enter the car, the defendant's Fourth

Amendment rights were not implicated.  See id. at 408 ("[i]n our view, conducting a dog sniff

would not change the character of a traffic stop that is lawful at its inception and otherwise

executed in a reasonable manner, unless the dog sniff itself infringed respondent's

constitutionally protected interest in privacy") (emphasis added).

In this case, by contrast, the search plainly exceeded the Fourth Amendment limitations

described in Caballes, as the inspection of the vehicle by the dog was not limited to the exterior

---

10      A case cited by the government in its initial Opposition, United States v. Hutchinson, 408 F.3d 796 (D.C. Cir. 2005), in no way dictates a different result.  In Hutchinson, the officers were investigating a stabbing and the defendant matched the description of the assailant.  The Hutchinson court directly linked the very brief extension of the stop in order to check Mr. Hutchinson's identification with the circumstances in that case, which were the proximity in time and place between the assault and the investigative stop, and the fact that Mr. Hutchinson was a very close match with the lookout description that was given for the assailant. In this case, by contrast, there is only alleged reasonable suspicion of a parking infraction (at most).  The present case is accordingly a far cry from Hutchinson.

of defendant's vehicle, but also included the interior compartment of the car–twice.  In other words, the Park Police officers acquired probable cause to search defendant's vehicle only after the drug-sniffing dog had already **twice** unconstitutionally entered and inspected Mr. McKoy's vehicle.  As there was no applicable exception to the warrant requirement that would justify the K-9's invasions of Mr. McKoy's vehicle, the evidence seized from Mr. McKoy's vehicle must be suppressed.

In its initial Opposition, the government relied on the pre-Caballes case United States v. Stone, 866 F.2d 359 (10th Cir. 1989), to support its argument that the K-9's initial entry into the vehicle did not taint the subsequent search of defendant's vehicle.  In Stone, the defendant was pulled over for speeding, and the defendant informed the police that he had just been pulled over for speeding earlier.  The police officer asked to see the ticket, and the defendant–on his own initiative and without being ordered by the police–stepped out of the car and opened the hatchback of the car to retrieve the ticket.  Id. at 361.  After he opened the hatchback, the defendant left it open.  When the drug-sniffing dog arrived on the scene, it jumped into the hatchback as part of its search and alerted for the presence of narcotics, which were subsequently recovered.  Id.  The Stone court stated that "the dog created a troubling issue under the Fourth Amendment when it entered the hatchback."  Id. at 363.  The court upheld the denial of defendant's suppression motion, however, as "there [was] no evidence that the police asked Stone to open the hatchback so the dog could jump in."  Id.

Tellingly, there is a more recent decision by the same Circuit (the Tenth) in which the court affirmed the district court's suppression of evidence on facts much more similar to the present case.  See United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998).  In

21

Winningham, the law enforcement agents themselves opened the door of the defendant's van. When the drug sniffing dog arrived on the scene, the dog leapt into the van and alerted for the presence of narcotics. Id. at 1329. The court held that the drug K-9's act of leaping into the van violated the defendant's rights under the Fourth Amendment and suppressed evidence. Id.

The Winningham court directly addressed the Stone case, distinguishing it on the key basis that in Stone, the door was opened by the defendant on his own initiative. Id. at 1330; see also id. at 1331 n.2. In Winningham, by contrast, "the officers themselves opened the door[.]" Id. at 1331. Importantly, the Winningham court did not rely on any intent by the officers to have the dog jump into the car.

> We do not state, nor do we imply, the officers 'encouraged' the dog to enter the vehicle. We do, however, draw a distinction between this case and Stone based upon the conduct of the officers that 'facilitated' the dog's entry into the van. In Stone, the defendant himself opened his vehicle and provided an opportunity for the dog to jump through the opening. Here, it was [a law enforcement agent] who opened the door to the van, thus creating the opportunity.

Id. at 1331 n.2.

Here, as in Winningham, Mr. McKoy should not bear responsibility for the open driver's door as that door was opened in direct response to an order from Officers Omo and Delgado. The officers did not direct Mr. McKoy to shut the door, so Mr. McKoy did not. A citizen should hardly be blamed for doing exactly what–and only what–the police order him to do during a traffic stop. The officers' order to exit the vehicle makes this case much more similar to Winningham than Stone and, accordingly, the result from Winningham–suppression of the unconstitutionally seized evidence–should obtain.

## **CONCLUSION**

Based on the foregoing proposed findings of fact and conclusions of law, defendant respectfully requests that this Court suppress the contraband and money allegedly seized from defendant's vehicle and his person on January 3, 2006.

Respectfully submitted,

A.J. Kramer
Federal Public Defender

_____/s/_____
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500, ex. 134