**IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 06-32 (HHK)** |
| | ) | |
| **GEORGE McKOY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the court's order at the conclusion of the November 16, 2006, motions hearing, the parties simultaneously filed proposed findings of fact and conclusions of law on January 15, 2007. Defendant, also pursuant to the court's order, hereby files this response to the government's proposals. Every ground the government puts forth to justify the search in this case is without merit.

## PROPOSED FINDINGS OF FACT

In its proposed findings of fact, the government claims that defendant's car stopped "right next to a parked car within the intersection" (GP 3).[1] The government cites several pages of the transcript for this statement (GP 3). However, Omo, the officer who stopped defendant, did not testify that defendant's car was "within" the intersection, as the government claims. Omo testified that he saw defendant's car "pull up to an intersection and come to a stop next to a parked vehicle" (M 8) (emphasis

---

[1] "GP" refers to the government's proposed findings of fact and conclusions of law.

added).[2]  Omo testified even more specifically, after having identified a photo of a car parked where defendant's car was on the night in question,[3] that the car was not in the intersection (A 11).  Thus, the government misstates the former part of Omo's testimony and neglects to mention the latter, and, contrary to the government's claim, Omo did not testify that defendant's car was within the intersection.

The government next states that "Omo determined that the driver of the Jaguar was obstructing traffic in violation of the District of Columbia's traffic laws" (GP 3).  It is true that Omo testified that he conducted the traffic stop for "obstructing traffic" (A 12).  However, he also testified that cars could proceed around defendant's car when it was parked (M 32).  Notably, Omo did not testify that there were any other cars traveling on 34th Street that night or whether there was any traffic at all, and thus whether defendant was in fact obstructing traffic.

The government states that Omo "pursued the vehicle" to initiate the traffic stop (GP 4).  Omo, however, testified that he was not following or pursuing defendant's car, but that he "tracked" it (M 40).

The government states that Omo three times told defendant to hang up his cell phone (GP 6).  In fact, Omo told defendant only twice to hang up the cell phone, once each time he talked on it (A 63-64).

---

[2]  The suppression hearing took place in the morning and afternoon of November 16, 2006.  There are separate transcripts for each session, and they are referred to in this response by "M" for the transcript of the morning hearing, and by "A" for the transcript of the afternoon session.

[3]  Omo said the car in the picture was parked where defendant's car was parked on the night of the stop, with the exception that defendant's car was three or four feet more towards the center of the street (M 35).

## PROPOSED CONCLUSIONS OF LAW

### I.     THE PURPORTED TRAFFIC STOP

The government has the burden of proving by a preponderance of the evidence the justification for a warrantless search and seizure.  United States v. Jackson, 415 F.3d 88, 92 (D.C. Cir. 2005); United States v. Davis, 270 F.3d 977, 981 (D.C. Cir. 2001).

The government's first contention is that the stop of defendant was a valid "traffic stop" (GP 9).  In support of this claim, the government relies solely on Title 18, D.C.M.R. § 2405.1(a) of the District of Columbia traffic code (GP 9).   This reliance is both factually and legally wrong.  Section 2405.1 prohibits standing, stopping, or parking a vehicle "within an intersection."  In the present case, not only has the government failed to meet its burden of proof, but also, as discussed above, Omo testified that defendant's car was not stopped or parked within the intersection.  Thus, the government has not established the factual basis for the stop, and it was, therefore, an invalid stop.

Even if there was a factual basis for the stop, which there was not, the government's legal justification is likewise flawed.  The government claims that the stop was permissible because Omo conducted a lawful traffic stop.  The government concedes, though, that § 2405.1 is a "non-moving violation," the penalty for which is a $50 fine only (GP 3 n.3).  The government cites no case allowing a traffic stop four-and-a-half blocks away from where a parking violation allegedly occurred.

3

The government relies primarily upon United States v. Bookhardt, 277 F.3d 558 (D.C. Cir. 2002), for the propriety of the stop.  In fact, Bookhardt supports defendant's position.  In Bookhardt, the officer had "probable cause" to stop and arrest the defendant "for the crime of reckless driving."  Id. at 567 (emphasis added).  However, after the stop the officer actually arrested the defendant for driving on an expired license, which turned out not to be a crime under the circumstances, but only a civil infraction.  Id. at 561.  The court held, however, that the arrest was "nonetheless valid if the same officer had probable cause to arrest the defendant for another offense."  Id. at 565 (footnote omitted)(emphasis added).[4]  The court noted that an arrest for an act which is not "actually a crime" is "invalid."  Id. at 565 n.9.

The government claims Bookhardt stands for the proposition that even if "Omo was mistaken about . . . whether obstructing traffic is considered a moving violation as opposed to a parking violation, Omo's decision to stop Defendant was nevertheless valid because he had reasonable ground to believe that defendant had committed some kind of traffic offense" (GP 10).  This assertion is both nonsensical and incredible, and finds no support in Bookhardt.  In Bookhardt, defendant was stopped for the criminal offense of reckless driving.

An officer cannot simply believe that a person "committed some kind of offense." To effect a traffic stop an officer must have "probable cause to believe that a traffic

_____

[4]        The government misstates the facts of Bookhardt as being that after defendant renewed his motion to suppress in Bookhardt, the "trial court nevertheless found that the arrest was valid, on the ground that the detective had probable cause to arrest the defendant for reckless driving" (GP 11).  In fact, in Bookhardt the district court granted the renewed motion to suppress -- the government then appealed and the court of appeals reversed the decision.  Id. at 561.

violation has occurred."  United States v. Whren, 517 U.S. 806, 808 (1996).  "[I]f courts

permitted officers to justify a stop on their subjective belief that traffic laws have been

violated, the potential for abuse of traffic stops as pretext for effecting stops for other

purposes 'seems boundless and the costs to privacy rights excessive.'" United States v.

Cole, 444 F.3d 688, 689 (5th Cir. 2006) (quoting United States v. Lopez-Valdez, 178

F.3d 282, 289 (5th Cir. 1999).  In the present case, the government has only identified a

civil parking violation it claims justifies the stop.  Besides the fact that defendant did not

factually violate § 2405.1, he was not stopped for a criminal offense, and the stop was

thus improper on this ground as well.  Because the stop was not a proper traffic stop,

either factually or legally, the evidence discovered as a result of the stop must be

suppressed.

**II.    STOP FOR ALLEGED DRUG TRANSACTION**

    **A.    The Stop Itself**

The government next claims that the stop was permissible because Omo

"possessed reasonable, articulable suspicion that defendant had just engaged in a drug

transaction" (GP 12).  However, when Omo stopped defendant, he had done nothing

more than stop his car for 30 seconds while someone got in and out, and then drove

away.  Omo did not see anything, suspicious or otherwise, take place in the car.  Nor

did he describe any suspicious action or movement by the person who came out of and

back into the house.  The only other fact alluded to by Omo was that the neighborhood

was a high drug area.

Reasonable suspicion requires that the government present "specific and articulable facts" to justify the stop. <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 374 (1993). Other than the person getting in and out of the car, there are no facts that support the claim that a drug transaction took place. Notably, the government cites no case finding reasonable suspicion for a stop on such comparable flimsy facts.

The validity of the stop depends upon the facts known at the time of the stop. "[A] search not justified when it is begun cannot be used to elicit evidence with which to justify the search after the fact." <u>United States v. Spinner</u>, No. 05-3160, slip op. at 7 n. * (D.C. Cir. January 16, 2007). Omo was "acting on an unsupported hunch instead of a reasonable suspicion" that defendant had engaged in criminal conduct, and thus the stop cannot be justified on this ground either. <u>United States v. Pruitt</u>, 174 F.3d 1215, 1221 (11th Cir. 1999). Because there was no reasonable suspicion for the stop, the subsequent search was improper.

### B.    <u>After The Stop</u>

Nor, contrary to the government's contention, did any facts discovered after the stop provide reasonable suspicion that defendant had engaged in a drug transaction. Defendant's statement that he was going to a barber shop was not contradicted -- none of the three officers testified either that there were no barber shops in the area or that they were closed. Omo did not testify, as the government claims, that the story "seemed highly implausible given the hour" (GP 14).

Moreover, as the D.C. Circuit recently recognized, a "person stopped by the police is entitled to be nervous." <u>Spinner</u>, slip op. at 8. "It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law

6

enforcement officer." <u>United States v. Beck</u>, 140 F.3d 1129, 1139 (8th Cir. 1998).  As in

the present case, "any nervous behavior [defendant] might have displayed was likely

accentuated by the appearance of another officer at the scene." <u>United States v.</u>

<u>Jones</u>, 269 F.3d 919, 929 (8th Cir. 2001).  Furthermore, Omo and Delegado "had never

met" defendant, and thus were "unfamiliar with his usual demeanor," so their

"evaluation of [his] behavior lacks any foundation." <u>Id</u>.[5]  Defendant's lack of response to

the request for consent to search his car is likewise entitled to no weight, because the

right not to consent "would be of little value if the very fact of choosing to exercise that

right could serve as any part of the basis for finding the reasonable suspicion."

<u>Spinner</u>, slip op. at 7 n. *.

### C.    The Stop Was Unlawfully Extended

The officers also impermissibly extended the stop of defendant.  It is clear that

the checks of defendant's registration, license, and criminal record took only a few

minutes, and that they all came back with no problem.  Yet the officers then ordered

defendant out of the car and questioned him, keeping his keys, license, and

registration, while Omo delayed writing the citation to await Daughtery's arrival.

"[W]hen officers detain travelers after the legitimate justification for a stop has

ended, the continued detention is unreasonable." <u>United States v. Portillo-Aguirre</u>, 311

F.3d 647, 654 (5th Cir. 2002).  The Fourth Amendment may be violated by "extending a

stop even three minutes beyond its permissible duration." <u>Id</u>.  Once a "dispatcher

---

[5]    Omo described the night as being cold, so it would not be unusual to walk
back and forth with arms crossed in an attempt to keep warm while being forced to wait
outside.  This is especially so where Omo did not testify whether defendant was
wearing a coat.

notified the officers about the defendants' clean records," the purpose of a traffic stop is over, and the "officers should have ended the detention and allowed the defendants to leave." Id.

Omo's questioning following the stop "should have been directed to securing [defendant's] license, registration, and insurance papers." United States v. Pruitt, 174 F.3d 1215, 1221 (11th Cir. 1999). "Once such brief questioning was completed," defendant "should have been free to go." Id. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Ceballes, 543 U.S. 405, 407 (2005).

In the present case, Omo had been notified about the validity of defendant's license and registration and the lack of any warrant for at least several minutes before Daughtery arrived. Instead of letting defendant leave, Omo delayed writing the citation, which he had no need to do in light of the fact that Delegado was also at the scene. Because the detention was improperly prolonged, the subsequent dog sniff was also improper.

## III.    THE DOG SEARCH

Finally, if the stop was valid, which it was not, the government claims that the actions of Finnegan, the drug dog, were permissible. In support of this contention, the government incorrectly claims that "[o]nce Finnegan began the process of alerting to the odor of drugs from outside the vehicle, probable cause developed to search the center console" (GP 18). However, it was not until after Finnegan was already in the car, for the second time, that he actually alerted to the drugs (A 34). Daughtery

8

described the alert as "a set of behaviors," culminating in a final response of sitting (A 33). Before jumping in the car the second time, Finnegan had not indicated there were drugs in the car but only that there was an "odor he was interested in" (A 34). Only after jumping in the car, sniffing the console, and sitting, was there enough to establish probable cause that drugs were in the car (A 34). The government's claim that Finnegan was "alerting to the narcotics" while outside the car during the second sweep is likewise wrong (GP 21). Indeed, the government also falsely claims that "all of the contraband was discovered only as a result of the second external sniff of the vehicle and the attendant alert to the narcotics odor as a consequence of that second external sniff" (GP 22). In fact, the drugs were discovered only because Finnegan entered the interior of the car, through a door that was opened only because the officers ordered defendant out of the car.

Contrary to the government's assertion, the alert took place only after Finnegan went into the car for the second time. Thus, probable cause was established only by means of Finnegan's entry into the car.

In Indianapolis v. Edmond, 531 U.S. 32, 40 (2000), the Court stated that "walk[ing] a narcotics-detection drug dog around the exterior" of a car was not a search. (Emphasis added) The Court's reasoning was that "an exterior sniff of an automobile does not require entry into the car." Id. (emphasis added) The Court concluded that a "sniff by a dog that simply walks around a car is 'much less intrusive than a typical search.'" Id. (quoting United States v. Place, 462 U.S. 696, 707 (1983).

Likewise, in Illinois v. Ceballes, where, unlike the present case the defendant had not been unlawfully detained, the Court emphasized that the "dog sniff was

9

performed on the exterior of respondent's car," and thus that there was no "constitutionally cognizable infringement." 543 U.S. at 409. The entry of Finnegan into defendant's car, not once but twice, impermissibly infringed on defendant's privacy interest.

The government's exclusive reliance on United States v. Stone, 866 F.2d 359 (10th Cir. 1989), for its claim that it was proper for Finnegan to enter the car, is misplaced for several reasons. First, as discussed in defendant's proposed findings, Stone is distinguishable factually from the present case in crucial respects. Second, also as discussed in defendant's proposed findings, Stone has been limited by the Tenth Circuit's own subsequent opinion in United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998). The government, notably, does not even mention Winningham. Third, and most important, Stone was decided before Edmond and Caballes, cases in which the Supreme Court made clear that a drug dog's entry into a car would be a search. Thus, even if the court somehow finds the stop and detention were permissible, the search was invalid because probable cause to search the car was gained only by the unlawful entry of the car by Finnegan.

## **CONCLUSION**

For all the reasons discussed above, and in his proposed findings of fact and conclusions of law, defendant respectfully requests that the court suppress the evidence in this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


        /s/
_____
JONATHAN S. JEFFRESS
Assistant Federal Public Defender
625 Indiana Avenue, NW
Suite 550
Washington, DC   20004
(202) 208-7500

11