UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. 06-0032 (HHK) |
| | : | |
| GEORGE MCKOY, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**GOVERNMENT'S REPLY TO DEFENDANT'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby replies to defendant's proposed findings of fact and conclusions of law, in the instant case. In support of this reply, the United States (hereinafter "United States" or "the Government") relies on the following points and authorities, the Government's initial Proposed Findings of Fact and Conclusions of Law (hereinafter, "Government's Proposed Findings"), and any additional evidence that may be adduced at a hearing on this matter.

1.  Defendant claims that the evidence in this case should be suppressed because Officer Omo's stop of defendant's vehicle was objectively unreasonable, inasmuch as there was no traffic violation that took place. Defendant George McKoy's Proposed Findings of Fact and Conclusions of Law (hereinafter "Defendant's Proposed Findings"), at 12. In this regard, defendant claims that Officer Omo "could not explain any of the key differences between the ticket [Omo issued to defendant] and the [District of Columbia Municipal Regulations] (hereinafter "D.C.M.R.")," Id. at 12-13, and he argues that Omo wrote the incorrect dollar amount on the ticket he issued to defendant: "[T]he amount of the fine for a violation of [18] D.C.M.R. § 2405.1 is $50 – not the $15 written on the ticket." Id. at 14. Finally, defendant

asserts that Officer Omo "stopped and ticketed defendant for an offense that does not exist[,]" and, therefore, "all evidence in this case must be suppressed." Id. at 13. Defendant completely ignores both the facts of this case and the law.

First, the record here fully supports a finding that defendant committed a traffic violation. Officer Omo testified unequivocally that he observed defendant's vehicle, while apparently still within the intersection, come to a stop parallel to a parked car (Tr. 7-9, 29-30, 32-33, 35).[1] He further testified that defendant's vehicle was parked "towards the center of the road," and described its location as "three or four feet" closer to the center than the Volkswagon depicted in the photograph shown to him by counsel for the defense (Tr. 34-35; see Def. Exh. 1).[2] In addition, Officer Omo testified that defendant's vehicle remained standing in the same spot for

---

[1] "Tr.__" refers to the morning hearing transcript of November 16, 2006, at the indicated page number(s), while "Tr.(P) __" refers to the afternoon transcript on that day at the indicated page number(s).

[2] A review of the Volkswagon shown in Defense Exhibit 1 reflects that the car is clearly blocking the right lane of the roadway. If defendant's car were approximately three to four feet closer to the center of the road, as described by Officer Omo, it would be almost in the center of the road. Indeed, a car in that position would force any vehicle traveling in that direction to have to pass what would amount to a narrow opening on the opposite side of the street.

In his Proposed Findings, defendant further asserts that "the record conclusively demonstrates as a factual matter that [defendant] was not parked in the intersection of 34th Street and Dubois." Defendant's Proposed Findings, at 15. In support of this claim, defendant points to several photographs depicting the Volkswagon car, not defendant's, parked at 34th Street and Dubios, and claims that it is "undisputed" that the vehicle depicted in the photographs is where defendant's vehicle was parked. Id. Defendant mischaracterizes Officer Omo's testimony. However, the record is clear that Omo testified that the car depicted in the photographs is only "approximately" in the location where defendant was observed parked. See Tr. 31 ("Q: Now, . . . the green Jaguar, you said was parked adjacent to a vehicle, somewhat like the vehicle in that photo [referring to Def. Exh. 1]? A: Yes, approximately."). Moreover, in response to a question from the Court concerning the location of defendant's car in comparison to the one depicted in the photo, Omo explained that defendant's car was several feet "further towards the center of the road" (Tr. 34-35).

approximately thirty seconds, then it pulled off and continued northbound down 34th Street (id. at 11). In light of what he saw, Omo concluded that defendant was both illegally double parked and had unlawfully parked within an intersection. Consequently, Omo issued defendant a ticket for what he termed "obstructing traffic," which he believed at the time to be a moving violation that carried a $15 fine.

On these facts, Officer Omo reasonably concluded that defendant had committed some traffic violation which justified the subsequent stop and issuance of a ticket. Indeed, a review of Title 18 of the D.C.M.R. reveals that defendant's actions could constitute a violation under 18 D.C.M.R. § 2405.1(a), which provides that no person shall stop, stand, or park a vehicle within an intersection, "except when necessary to avoid conflict with other traffic, in compliance with law, or at the direction of a police officer or traffic control device." See 18 D.C.M.R. § 2405.1(a). Indeed, while Officer Omo testified that he saw defendant pull to a stop within the intersection, certainly, there is no evidence in the record to suggest that defendant did so in order "to avoid conflict with other traffic, in compliance with law, or at the direction of a police officer or other traffic control device."[3] Officer Omo's testimony also reasonably supports a finding that

---

[3] At one point defendant argues that it "makes no sense" to apply 18 D.C.M.R. § 2405.1(a) to a "T-intersection," like the one described by Officer Omo in this case, because "[t]he obvious purpose of [18] D.C.M.R. § 2405.1 is to ensure that traffic can proceed smoothly through an intersection[, which is] in no way advanced by application to a car that is stopped at the base of a T-intersection." Defendant's argument is completely without merit. First, it is "obvious" to no one that the purpose of the regulation is merely so that "traffic can proceed smoothly through an intersection." Second, defendant has cited no authority in support of this contention, in fact because there is none. And, finally, most importantly, the District of Columbia's traffic regulations define "intersection" as "[t]he area embraced within the prolongation or connection of the lateral curb lines or, if none, then of the lateral boundary lines of two (2) or more roadways which join one another at an angle, whether or not one such roadway crosses the other." 18 D.C.M.R. § 9901 (emphasis added); see also D.C. Transit System, Inc. v. Coffey, 190 A.2d 819,
(continued...)

defendant violated provisions under 18 D.C.M.R. § 2401, including §§ 2401.1 and 2401.2.[4] It is of significant import here that, at the time of Officer Omo's observations, it was almost midnight and Omo was stopped at a traffic light a couple of blocks away from defendant on Eli Street and Minnesota Ave. Thus, the distance and obviously less-than-ideal lighting conditions facing Omo at the time are considerations that factor into the reasonableness calculus. Indeed, although defendant argues strenuously to the contrary, the law does not require that an officer's observations be precise. Rather, "[p]robable cause exists where 'the facts and circumstances within [an arresting officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Draper v. United States, 358 U.S. 307, 313 (1959) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)); United States v. Caroline, 792 F.2d 197, 201 (D.C. Cir. 1986) ("Probable cause for a search exists where 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); see also United States v. Prandy-Binett, 995 F.2d

---

[3]/(...continued)
820 (D.C. 1963) . Thus, clearly, the definition of intersection encompasses a "T-intersection" like the one that is at issue in this case. Defendant's assertion here is therefore baseless.

[4]/ 18 D.C.M.R. § 2401.1 provides that "[i]f no curb space is available within a reasonable distance, a passenger vehicle may stand parallel <u>and as near as practicable to other parked vehicles, only long enough to take on passengers who are actually waiting at the curb or to leave off passengers</u>. (Emphasis added). Similarly, § 2401.2 states that "a vehicle may stop parallel <u>and as near as practicable to parked vehicles while loading</u>. . . ." (Emphasis added). Officer Omo's testimony reveals that defendant was not parked "as near as practicable to other parked vehicles," and, with specific regard to § 2401.1, the record supports that defendant did not remain standing "only long enough to take on passengers who are actually waiting at the curb or to leave off passengers," because here the unknown individual who entered defendant's car exited the house, entered and remained inside the vehicle for several moments, then exited the vehicle.

1069, 1070 (D.C. Cir. 1993) ("Somewhere between less than evidence which would justify conviction and more than bare suspicion, probable cause is satisfied. The precise point is indeterminate.") (citation and internal quotations omitted); United States v. Copeland, 321 F.3d 582, 592-93 (6th Cir. 2003) (probable cause exists "where an officer reasonably believes that an individual has committed a violation, even if in hindsight this was not the case") (citation omitted). Because here there was at least a "fair probability" that defendant committed a traffic violation, Officer Omo's actions in stopping and ticketing defendant were justified.

      Second, contrary to defendant's bare assertions, it is of no legal moment that Officer Omo may have incorrectly classified the infraction he observed here as "obstructing traffic," or that he wrote down the incorrect amount of the fine on the ticket, <u>so long as what he saw amounted to what a reasonable police officer would have concluded constituted a traffic violation</u>. Here, the law is settled that merely because an officer incorrectly states the reason for a stop, such a mistake does not render the stop an invalid one, so long as the officer observed an offense take place. See United States v. Bookhardt, 277 F.3d 558, 564 (D.C. Cir. 2002) ("an arrest will be upheld if probable cause exists to support an arrest for an offense <u>that is not denominated as the reason for the arrest by the arresting officer</u>") (citation omitted; emphasis added); Bell v. United States, 254 F.2d 82, 86 (D.C. Cir. 1958) ("The question is <u>not what name the officer attached to his action; it is whether, in the situation in which he found himself, he had reasonable ground to believe a [crime] had been committed</u>") (emphasis added); see also Copeland, 321 F.3d at 592-93 (probable cause exists "where an officer reasonably believes that an individual has committed a violation, even if in hindsight this was not the case") (citation omitted).

In <u>United States v. Prandy-Binett</u>, <u>supra</u>, 995 F.2d at 1069, the District of Columbia Circuit Court of Appeals held that a detective had probable cause to arrest the defendant after observing the defendant in possession of a small rectangular block wrapped in silver duct tape, which to the detective signified a kilogram of illegal narcotics. The Court stated: "We cannot say exactly how probable it was that the block contained drugs, but we are convinced that it amounted, at the least, to a 'fair probability' [the defendant] was committing <u>an offense</u>." <u>Id.</u> at 1072 (citations omitted; emphasis added). The Court noted that the district court, which had found that the police did not have probable cause to arrest the defendant and therefore had suppressed the drugs, "was evidently troubled by the fact that without further investigation . . . the officer could not know whether [the defendant's] crime was possession of heroin or possession of cocaine." <u>Id.</u> at 1073 (emphasis added). The Court, brushing aside this concern, articulated that:

> If [the defendant's] perfume bag held clear ziplock bags containing white powder, the detectives also would not have been sure whether he possessed cocaine or heroin (or some innocuous substance). Yet that cannot be a reason for finding no probable cause. It is simply not the law that officers must be aware of the *specific* crime an individual is likely committing. <u>It is enough that they have probable cause to believe the defendant has committed one or the other of several offenses, even though they cannot be sure which one</u>. The police may arrest an armed individual running from a store in the dead of night while the burglar alarm is sounding, even though they cannot be certain whether the suspected crime is attempted burglary, burglary, attempted robbery, robbery or unlawful possession of a firearm.

<u>Id.</u> at 1073-74 (emphasis in original; second emphasis added; citations omitted). <u>See also</u> <u>Copeland</u>, 321 F.3d at 592-93 (probable cause exists "where an officer reasonably believes that

an individual has committed a violation, even if in hindsight this was not the case") (citation omitted). Defendant's claim here therefore lacks merit.

2.    Defendant also avers that, even assuming that defendant committed a (non-moving) traffic violation in this case, police were not "constitutionally permitted to stop defendant for an antecedent civil parking violation." Defendant's Proposed Findings, at 15. In support of this claim, defendant asserts that there are no federal cases "directly on point," then cites the Minnesota Supreme Court decision of State v. Holmes, 569 N.W.2d 181 (Minn. 1997), to buttress his argument. First, defendant is simply wrong – although the issue of whether a parking violation can justify a Terry[5] stop has not been addressed in this circuit, see United States v. Spinner, No. 05-3160, 2007 WL 92701 (D.C. Cir. January 16, 2007),[6] several other federal circuits have squarely faced this very question, and each has found no legally meaningful distinction between a parking and a moving violation. See United States v. Choudhry, 461 F.2d 1097, 1103 (9th Cir. 2006) (concluding that a parking violation provided reasonable suspicion for a stop, even though the state traffic regulations provided that parking violations were enforced through civil-administrative scheme); Flores v. City of Palacios, 381 F.3d 391, 402-03 (5th Cir. 2004) (finding that parking violation gave police authority to conduct stop under Whren); Copeland, 321 F.3d at 594 (same); United States v. Thornton, 197 F.3d 241, 248 (7th Cir. 1999) (same). A detailed discussion of Choudhry is particularly instructive here.

---

[5] Terry v. Ohio, 392 U.S. 1 (1968).

[6] Although the D.C. Circuit Court of Appeals had before it the issue of whether police properly detained a subject whom they believed had committed a parking violation, the Court never reached this question as it found that the police lacked reasonable suspicion to justify a subsequent search of his vehicle. Spinner, 2004 WL 92701, at *3.

In Choudhry, just after midnight, police officers observed a vehicle parked near the entrance of an area designated as a no-stopping/tow-away zone between the hours of 10 p.m. and 6:00 a.m. daily. 461 F.3d at 1098-99. Unable to determine whether the car was occupied, the officers shone the police car's spotlight on the vehicle. Id. at 1099. In response, the vehicle's occupants made "hurried movements," which led the officers to believe that either a sexual encounter or "some other possible illegal act" was taking place. Id. Consequently, officers decided to investigate further and turned on their emergency equipment in order to conduct an investigatory stop of the vehicle. Id. The driver of the vehicle then turned on the engine and began to pull away. Id. Before doing so, however, the officers had exited their patrol car and commanded the driver to stop, which he did. Id. While the driver was being questioned, police also spoke with the defendant, who was a passenger in the vehicle. Id. After it was determined that the driver's license had been suspended and there were two active warrants for the driver's arrest, the driver was placed under arrest. Id. Meanwhile, the defendant was ordered out of the car and, because the officer questioning the defendant had smelled marijuana emanating from the vehicle, a pat-down search of the defendant was conducted. Id. While this was taking place, the defendant admitted that he had marijuana in his pants pocket, and he advised the officer that he had found a gun, which he had then placed inside the driver's car. Id. Police subsequently discovered a gun underneath the passenger seat where the defendant had been sitting. Id.

The defendant was subsequently charged with being a felon in possession of a firearm. Id. at 1098. Before trial, the defendant, like defendant in the instant case, challenged the lawfulness of the stop, arguing that a civil parking violation that was enforced through an administrative process could not, standing alone, justify an investigatory stop. Id. In rejecting

the defendant's argument that a different standard should be applied with regard to parking infractions from the standard which was to be applied concerning the existence of reasonable suspicion in the context of moving traffic violations, the Ninth Circuit concluded that the Supreme Court's decision in Whren[7] was also controlling here.  See id. at 1101-02.  In discussing the scope of the Court's holding in Whren, The Ninth Circuit enunciated that:

> In separating civil parking violations and criminal activity, [the defendant] reads Whren more narrowly than that decision and our circuit law permit.  Although the reasonable suspicion inquiry *does* center on suspected criminal activity, Whren carves out an exception in the context of traffic stops, i.e., a stop is "reasonable" where an officer suspects an individual has committed a traffic violation.  517 U.S. at 810.  Whren is not limited to "criminal" traffic code violations.  In fact, the case specifically contemplated the opposite: at the outset of the opinion, the Court noted that it was addressing the [defendants'] appeal in the scope of "civil traffic violation[s]."  Id. at 808.  The court explicitly declined to distinguish among different types of traffic code violations, be they standing or moving violations.  See id. at 818-19. . . . Thus, Whren does does not distinguish between traffic violations enforced through a civil-administrative process and traffic violations subject to criminal enforcement.

Choudhry, 461 F.3d at 1102.  (Emphasis supplied in original).

Second, defendant's reliance on Holmes, supra, 569 N.W.2d at 181, is misplaced.  In Holmes, the Supreme Court of Minnesota was faced with the question of whether police were reasonable in conducting an investigatory stop of a defendant who had illegally parked a car with seven prior parking tickets in an unauthorized parking lot on the University of Minnesota campus, and was subsequently observed by police approaching the car.  Id.  A parking monitor employed with the university had initially discovered the defendant's vehicle unattended and

---

[7] Whren v. United States, 517 U.S. 806 (1996).

found that it did not have the appropriate permit for the lot where the vehicle was parked. Id. The monitor, upon discovering that there were already seven unpaid parking tickets on the car, wrote the ticket and requested that a tow truck remove the car from the lot. Id.

After the monitor wrote the ticket and was waiting for the tow truck, the defendant and another person approached and entered the vehicle. Id. The defendant, who was unable to drive off because the monitor was blocking his vehicle, began retrieving his belongings from the vehicle upon learning that the vehicle would be towed because of the outstanding tickets. Id. at 182-83. Within a short time, however, a campus police officer arrived on the scene, approached the defendant, and asked him to remove his hands from his pockets and provide some identification. Id. at 183. After the defendant again placed his hands in his pockets, the officer asked him again to remove his hands from his pockets and accompany her back to her squad car. Id. The officer then placed the defendant in the squad car, but prior to doing so, she patted the defendant down for weapons. Id. During the patdown, the officer felt a hard object and asked the defendant what it was. Id. The defendant initially did not respond, but he then gave the officer consent to search his pockets and told the officer that the object was a magazine clip. Id. Although the defendant initially allowed to leave the scene, the vehicle remained for towing. Id. A subsequent inventory search of the car revealed a handgun in the glove compartment, and the defendant was subsequently placed under arrest. Id. at 183-84.

On these facts, the Minnesota high court held that while the police did possess a reasonable suspicion that the defendant had illegally parked a car with several prior parking tickets, they did not have an objective basis for suspecting the defendant of any criminal activity. Holmes, 569 N.W.2d at 185. In reaching its conclusion, the court noted significantly that the

parking monitor "already had enforced the [parking] violation by issuing the ticket and ordering the tow." Id. (Emphasis added).

In spite of the court's holding in Holmes, the court nevertheless recognized that "[a] police officer who has probable cause to believe that a person has committed a parking violation can stop the person . . . if the stop is necessary to enforce the violation, for example, if a person attempted to drive off with an illegally parked car before the officer can issue the ticket." Id. (Emphasis added). In the instant case, Officer Omo was faced with precisely this circumstance. Specifically, Omo testified that when he first observed the traffic infraction, he was some distance away at a red traffic light. Once the light changed, Omo proceeded to "track" defendant and eventually initiated the stop at 34th and A Streets, S.E., some four blocks away from the location of the incident. Defendant here makes the specious argument that since defendant's infraction constituted a parking violation, Officer Omo simply could have affixed a parking ticket to the windshield of defendant's car. This assertion completely ignores the undisputed fact that defendant drove his car away from the scene prior to the time that Officer Omo arrived there. Consequently, Officer Omo had no choice but to effect a lawful traffic stop on defendant. See Copeland, 321 F.3d at 594 (officer can effect a traffic stop based upon the driver's failure to comply with Michigan's parking regulations, even if the vehicle is no longer parked).

Defendant also cites United States v. Bookhardt, supra, 277 F.3d at 558, as support for his claim that police lacked authority to initiate a traffic stop on defendant for committing a parking violation. Defendant's reliance on Bookhardt for such a proposition too is misplaced. As discussed in the Government's Proposed Findings, Bookhardt involved the authority of the police to effectuate an arrest on a subject where the offense, driving on a suspended license for up to

11

ninety days, amounted to merely a civil infraction. The Court held that police did not have such authority to <u>arrest</u> the defendant under those circumstances. <u>Id.</u> at 561. This case is readily distinguishable from <u>Bookhardt</u> because the instant case does not involve an <u>arrest</u> for a civil traffic violation, but, rather, a <u>stop</u> for the violation. Furthermore, the <u>Bookhardt</u> Court ultimately upheld defendant's arrest, on the ground that the arresting officer nevertheless had probable cause to arrest the defendant for reckless driving: "As long as [the arresting officer] had an objective ground upon which to arrest [the defendant], the fact that [the officer] articulated an invalid one does not render the arrest unlawful." <u>Id.</u> at 566.

3.  Defendant further argues that the traffic stop of defendant exceeded constitutional limitations because the stop lasted longer than was necessary to effectuate the purpose of the stop. Defendant's Proposed Findings, at 17-18. However, as asserted in the Government's Proposed Findings, the duration of the stop was not unreasonable, as the arrival of canine Officer Daugherty and the use of his drug-sniffing dog to conduct a scan of defendant's car all took place while the traffic stop was still in progress. Indeed, Officer Omo's testimony reflected that after initiating the traffic stop, he conducted the normal inquiries incident to such a stop, and during this time he requested Officer Daugherty's assistance, and that, upon Officer Daugherty's arrival, Omo went and advised Daugherty of the situation, then returned to his vehicle and finished writing the traffic citation (Tr. 14-18, 21-24; Tr. (P) 14). Thus, contrary to defendant's contention, there was no downtime in between the traffic stop initiated by Officer Omo, and the arrival of Officer Daugherty and his subsequent scan of defendant's vehicle. <u>See</u> <u>Illinois v. Caballes</u>, 543 U.S. 405, 407-08 (2005) (no infringement on the defendant's fourth amendment rights where, despite use of drug-sniffing dog to scan around car, lawful traffic stop was not

extended beyond the time necessary to issue warning ticket and conduct ordinary inquiries associated with such a stop);[8] cf. United States v. Williams, 429 F.3d 767, 772 (8th Cir. 2005) (traffic stop not reasonably prolonged where the wait for the drug-sniffing dog was only five to six minutes); United States v. Carpenter, 406 F.3d 915, 916-17 (7th Cir. 2005) (five-minute delay while drug-sniffing dog arrived was not unreasonable).

     Moreover, as the Government asserted in its Proposed Findings, Officer Omo was even further justified in stopping defendant because, wholly independent of his observance of the traffic violation, Omo possessed a reasonable suspicion that defendant had engaged in a drug transaction. Therefore, the amount of time it took police to conduct a Terry stop was clearly not unreasonable here. See United States v. Sharpe, 470 U.S. 675, 685 (1985) (finding there is "no rigid time limit on Terry stops); see also United States v. Lebrun, 261 F.3d 731. 734 (8th Cir. 2001) (twenty-minute detention, based upon reasonable suspicion, following traffic stop while officer awaited arrival of drug dog was not excessive); United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994) (one-hour time period between when officer pulled the defendant over for traffic violation and when officer arrested the defendant was not unreasonable period to wait for drug dog to verify officer's suspicion that vehicle contained drugs; whether a seizure by police should be found unconstitutional because it lasted too long depends, in part, on the amount of time that is required to effect a legitimate law enforcement purpose); United States v. Hardy, 855

---

[8]/ Defendant asserts that the traffic stop in the instant case was "far longer than the 10 minutes the Supreme Court stated was permissible in Caballes." Defendant's Proposed Findings, at 19. Defendant misstates the Court's holding in Caballes, as nowhere in the Court's opinion does the court impose a numerical time limitation on what constitutes a reasonable period of time for a traffic stop to occur. Thus, the fact that the duration between the traffic stop and the finding of probable cause was roughly 14 minutes here does not lead to the conclusion that the stop was unreasonably prolonged.

F.2d 753, 758-60 (11th Cir. 1998) (finding that trooper, who possessed a reasonable suspicion that defendant possessed drugs, acted with dispatch in obtaining drug-sniffing dog and fifty minute delay did not invalidate the detention, particularly due to the trooper's avoiding any questioning of the defendant during the waiting period and the fact that closest dog was some twenty-five miles from location of stop).

4.    Defendant finally challenges the admission of evidence found in his vehicle on the ground that police exceeded their authority by permitting the drug-sniffing dog to enter defendant's car during the exterior scan of the car.  Defendant's Proposed Findings, at 20-22.  In support of this argument, defendant cites to United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998), and claims that the facts of Winningham are "much more similar to the present case" than the case previously cited by the Government, United States v. Stone, 866 F.2d 359 (10th Cir. 1989).  Defendant is wrong.

In Stone, the Tenth Circuit Court of Appeals held that the fourth amendment was not implicated, despite the fact that during a valid Terry stop of the defendant's vehicle, a trained drug dog leapt into the open hatchback door of the defendant's car and keyed to a duffle bag inside, which was later found to contain drugs.  866 F.2d at 364.  The court reasoned that the dog's actions were "_instinctive_," and further noted that there was no evidence that the police had asked the defendant to open the hatchback so the dog could jump in, nor was there evidence that the dog's handler encouraged such behavior.  Id.[9]  (Emphasis added).

---

[9] Other circuits have held that a dog's instinctive behavior does not implicate the fourth amendment.  See United States v. Reed, 141 F.3d 644, 650 (6th Cir. 1998) (holding that a trained drug dog's instinctive reactions to the nature of the contraband, here the apparent movement of dresser drawers which contained contraband inside, did not implicate the Fourth Amendment);
(continued...)

By contrast, in Winningham, border patrol agents stopped a van on the reasonable suspicion that it might be carrying undocumented aliens at one point had opened the defendant's door and asked him to exit the van . 140 F.3d at 1329. One of the agents approached the driver, the defendant, and asked for permission to search the van for illegal aliens, to which the defendant consented. Id. The defendant was then asked to step out of the van, upon which the agent opened the sliding door of the van and conducted a visual search of its interior. Id. The agent saw no one inside, but he did not close the door; instead, the agent told the defendant that he also had information that the van was carrying narcotics and asked for permission to "run a dog on the vehicle." Id. The defendant again agreed, and within several minutes a trained drug-sniffing dog arrived on the scene. Id. During a scan of the vehicle, the dog's handler unleashed the dog; when the dog reached the open door, it jumped into the van and methodically sniffed its interior until it alerted at a rear vent. Id. at 1330. A search of the vent revealed fifty kilograms of marijuana and defendant was subsequently arrested for possession with intent to distribute marijuana. Id.

In granting the defendant's motion to suppress evidence, the Tenth Circuit found that Stone differed from Winningham in two meaningful respects. Id. at 1330. First, the court stated that there, unlike the officers in Stone, who neither opened the hatchback door nor encouraged the dog to enter the vehicle, the agents

> themselves opened the door, allowing the van to sit on the side of
> the highway with the sliding door wide open for a period of at least
> six minutes until the drug dog could arrive. The dog handler then
> unleashed the dog as the dog neared the open door. A desire to

---

[9]/(...continued)
United States v Lyons, 957 F.2d 615, 617 (8th Cir. 1992) (same).

> facilitate a dog sniff of the van's interior, absent in <u>Stone</u>, seems
> readily apparent here.

140 F.3d at 1331.

Second, the court found that the officers in <u>Stone</u> were acting under reasonable suspicion, whereas the agents in <u>Winningham</u> did not:

> "[R]easonable suspicion was exhausted [here] after [the agent] searched the van's interior. The subsequent police activity – detaining the van for six minutes to await the dog and allowing the dog to sniff any portion of the van, internal or external – was permitted, if at all, by [the defendant's] consent, not by reasonable suspicion.

<u>Id.</u>

In the instant case, the actions by the officers virtually mirrored the officers' behavior in <u>Stone</u>. Here, Officers Omo and Delgado asked defendant to step out of the vehicle, but did not themselves open the door to assist him. And, although defendant was not given any further direction by police, he left the door open, and it remained open when the scan of the vehicle took place. Further, unlike the dog handler in <u>Stone</u>, Officer Daugherty kept his trained dog on the leash throughout the scan. In addition, significantly, when the dog initially jumped into the driver's door of the vehicle, Officer Daugherty immediately pulled him out. All of the officers' actions, particularly the latter effort by Officer Daugherty, clearly demonstrate that they had no desire "to facilitate a dog sniff of the [vehicle's] interior." <u>Winningham</u>, 140 F.3d at 1331. Thus, because the conduct by the officers here more squarely fits with the officers' conduct in <u>Stone</u>, that case should be applied here, and <u>Winningham</u> should be deemed inapposite.

In his attempt to distinguish <u>Stone</u> from the facts of the instant case, defendant states that "[a] citizen should hardly be blamed for doing exactly what – and only what – the police order

16

him to do during a traffic stop." Defendant's Proposed Findings, at 22. Yet, in Stone, the defendant there also did precisely what the police instructed him to do. A closer look at the facts in Stone reveal that, upon being stopped by police, the defendant informed the officer that he had been stopped earlier by police. 866 F.2d at 361. The officer then asked to see the ticket, and the defendant responded that it was in the rear of the hatchback. Id. The officer then reiterated that he would like to see the ticket, whereupon the defendant got out of the car, opened the hatchback, and retrieved the ticket. Id.

The exchange between the police officer and the defendant in Stone leave no doubt that the officer there was implicitly directing the defendant to exit his car and retrieve the ticket himself from the hatchback – indeed, the defendant apparently was left with no other choice but to comply with the officer's demand. Thus, the facts here are really no different from the facts of Stone, therefore this Court should find that the Tenth Circuit's holding in Stone should be applied in the instant case.

Respectfully submitted,

JEFFREY A. TAYLOR (D.C. Bar No. 498610)
United States Attorney

By:      /s/
_____
DONNELL W. TURNER (Maryland Bar)
Assistant United States Attorney
Federal Major Crimes Section
United States Attorney's Office
555 Fourth Street, N.W., Room 4235
Washington, D.C. 20530
(202) 305-1419
(202) 514-6010 (fax)
www.donnell.turner2@usdoj.gov