UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GEORGE MCKOY,<br><br>Defendant. | Criminal 06-032  (HHK) |

MEMORANDUM OPINION

Before the court is the motion of defendant George McKoy to suppress items which the government intends to introduce in evidence against him in a trial of this case that were taken from the car he was operating in the early morning hours of January 4, 2006, after he was stopped by United States Park Police Officer James Omo.  McKoy claims that this evidence must be suppressed because it was seized after, and as a result of, police conduct that violated his rights under the Fourth Amendment.  Upon consideration of the motion, the opposition thereto, and the evidence presented at a hearing on the motion, the court concludes that the motion must be denied.

I. FACTS

Based upon the evidence presented at the hearing on McKoy's motion, including the testimony of the witnesses who testified at the hearing, each of whom the court found to be credible, the court finds that the following occurred.

At approximately 11:54 p.m. on January 3, 2006, Officer Omo, a four-year veteran of the United States Park Police, while on patrol operating a marked police vehicle, observed a green 2003 Jaguar being operated northbound on 34th St. S.E. towards a T-shaped intersection at Dubois St.  From his vantage point at the intersection of Eli and Minnesota Avenue, S.E., one and one-half blocks away,  he saw the operator of the Jaguar bring it to a stop on 34th St., a "tight" two way street, in the only travel lane for the direction in which the car was proceeding and parallel to a parked car.  Omo also thought the Jaguar had been brought to a stop in the intersection of 34th and Dubois, but he was mistaken.  At the point it was brought to a stop, it was several feet beyond the T-shaped intersection, positioned in relation to the intersection as is the Volkswagen displayed in Defense Exhibit 1.

      Shortly after the vehicle stopped, Officer Omo saw a man, dressed only in jeans and a white T-shirt — apparel worthy of note because it was seasonally cold for a January night — run from a nearby residential apartment building and enter the Jaguar through the front passenger-side door.  The man remained in the Jaguar for approximately 20 to 30 seconds and then quickly returned to the building from whence he came.

2

Suspecting that the operator of the car and the man in the T-shirt had engaged in a drug transaction[1] and believing that the driver of the Jaguar had committed a traffic offense, Omo effected a stop of the car shortly before midnight, at approximately 11:56 p.m., about four blocks away at 35th and A St., S.E.

After stopping the Jaguar, Omo asked the driver, defendant McKoy, for his driver's license and the vehicle's registration, both of which were produced and then subjected to standard law enforcement checks without anything turning up that would warrant further inquiry. Omo also engaged a nervous and "fidgety" McKoy in conversation that included asking him about the activity of the man with whom he had just had contact at 34th and Dubois, asking him "where he was headed," Tr. 15, and commenting on the complaints residents in the area had made regarding drug trafficking. With respect to the man who had quickly entered and left his car, McKoy told Omo that he (Mckoy) was "just dropping someone off." Tr. 14. McKoy also stated that "he was going to get a haircut up the street." Tr. 15. Omo determined that these statements were improbable and, with respect to the activity of the man who had jumped into the Jaguar at 34th and

---

[1]   Omo's suspicion was based upon the curious conduct of the person who entered the green Jaguar and his familiarity with the neighborhood where numerous citizen complaints had been made about illegal drug activity and where many drug arrests had been made.

Dubois, a prevarication. These statements also heightened Omo's suspicion that McKoy had been involved in illegal drug activity.

About six minutes after initiating the stop, at approximately 12:02 a.m. on January 4, 2006, Officer Omo called for a drug detection dog. The dog, Finnegan, accompanied by its handler, Officer Jeff Daugherty, arrived on the scene, in approximately 10 minutes, at approximately 12:12 a.m, approximately 16 minutes after Officer Omo initiated the stop. In the meantime, McKoy had removed himself from the Jaguar, at Omo's direction, and left the driver's side door open.

Shortly after arriving on the scene, Finnegan and Daugherty began to scan the perimeter of the Jaguar to determine whether Finnegan would detect the odor of illegal drugs. With Finnegan on a leash, Daugherty began in the front of the car and proceeded in a counter -clockwise direction. When he arrived at the open driver's side door of the Jaguar, Finnegan jumped into the driver's seat. The dog was immediately removed from the car by Daugherty who continued his scan with Finnegan in a counter clockwise direction. When Finnegan arrived at the left tail lamp, Daugherty noticed that the canine sniffed intensely but he did not alert to the presence of illegal drugs. Daugherty and Finnegan then continued around to the front of the car, completing the initial scan.

4

After the initial scan, Daugherty and Finnegan reversed their direction, in a clockwise direction. Again, when Finnegan arrived at the left tail lamp he showed some interest, but continued on without alerting to the smell of narcotics. Daugherty and Finnegan continued in a clockwise direction around the car. This time, however, when Finnegan reached the open driver's door, he turned his head, sniffed, and jumped in the vehicle. He went immediately to the center console area, sniffed it intensely, jumped into the front passenger seat, turned to face his handler, and placed his nose back on the center console, indicating to Daugherty an alert to the presence of illegal drugs.

Believing that this alert gave them cause to believe that the car contained an illicit substance, Park Police officers effected a search of the car. A search of the center console revealed a clear sandwich bag containing three zip-locked bags of crack cocaine and a zip-locked bag containing marijuana. A search of the car's trunk yielded, among other items, a backpack near the left rear tail lamp containing zip-locked containers of crack cocaine.

## II. ANALYSIS

McKoy claims that his Fourth Amendment rights were violated by unlawful police misconduct at three points in his encounter with the police on January 3–4, 2006. First, McKoy claims that he was illegally stopped by Officer Omo shortly before midnight on January 3, because, he had not committed a

5

traffic offense, "obstruction of traffic," the reason Officer Omo gave for conducting the stop, nor any other infraction sufficiently serious to warrant a "traffic stop." Second, even if properly stopped for a traffic offense, the time that elapsed between the stop and Finnegan's drug alert, was impermissibly extended. Third, the Jaguar was entered by Finnegan twice without cause, infringing upon McKoy's constitutionally protected right of privacy. Each of these contentions will be addressed in turn.

**A.    WAS MCKOY STOPPED ILLEGALLY?**

McKoy argues that he was stopped illegally because he did not commit a traffic offense of any kind and certainly not one serious enough to warrant his being stopped by Officer Omo. Specifically, McKoy argues that he did not commit the infraction for which he was purportedly stopped — obstruction of traffic — and, even if he did commit an infraction, the infraction was a parking violation not a moving violation and, thus, was insufficiently serious. McKoy's position cannot be sustained.

Assuming for the sake of analysis that McKoy had not committed a traffic offense before he was stopped, that such is so does not advance McKoy's position that he was stopped illegally. The pertinent law is settled, "[t]he decision to stop an automobile is reasonable where the police have *probable cause* to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810

6

(1996) (emphasis added). This formulation of course means that a police officer is not required to *know* with certainty that a traffic violation has occurred in order to be able properly to stop a motorist. What is required is that the officer has *probable cause* to believe that such a violation has occurred. Here, the court has no difficulty finding that Omo had probable cause to believe a traffic violation occurred when he saw the driver of the Jaguar stop the vehicle, for no apparent reason having to do with a need to properly operate the vehicle, on a "tight" city street, very near an intersection, in one of two travel lanes proceeding in opposite directions. A driver of a car approaching from the rear of the Jaguar would have been required to enter into a lane of traffic meant only for cars being operated in the opposite direction.

      The fact that Omo incorrectly identified the infraction which he had reason to believe McKoy had violated is of no moment as long as he had reason to believe that a traffic infraction occurred. Put another way, Omo's competence, or lack thereof, with respect to his knowledge of District of Columbia vehicle and traffic regulations has no bearing on whether, as an objective matter, he had probable cause to believe that McKoy committed a traffic violation. Here, Omo had probable cause to believe that McKoy violated two District of Columbia vehicle and traffic regulations. 18 D.C. Mun. Regs. § 2405.1, in pertinent part, provides: "No person shall stop, stand, or park a vehicle in any of the following

7

places . . . (a) [w]ithin an intersection." 18 D.C. Mun. Regs. § 2401.2, in pertinent part, provides: "[A] vehicle may stop parallel and as near as practicable to parked vehicles while loading; Provided, that the vehicle while so parked will not unreasonably impede or interfere with orderly two-way traffic."

      With respect to §12405.1, Omo had probable cause to believe that the driver of the Jaguar had brought it to a stop in the intersection, although the car in fact had been brought to a stop just beyond the intersection, by a matter of several feet, but no more than the length of a standard sized car.  Omo also had probable cause to believe that the driver of the Jaguar had violated § 2401.2, which prohibits the stopping of a vehicle for the purpose of loading or unloading in a manner that might "unreasonably impede or interfere with orderly two-way traffic."

      McKoy's argument that Omo's stop of him was unlawful because any infraction Omo had reasonable cause to believe he had committed was not sufficiently serious, as evidenced by their designation in the regulations as "parking" infractions, must be rejected for the simple reason that the argument is foreclosed by precedent this court is bound to follow.  McKoy argues that even if Officer Omo had reason to believe that he committed a violation of § 2405.1, Omo could not lawfully perform a traffic stop because such a violation is not

"criminal."[2] Def.'s Proposed Findings at 15. The problem for McKoy is that his argument is foreclosed by the Supreme Court's decision in *Whren v. United States*, 517 U.S. 806 (1996), a seminal case arising from this judicial district that addresses the constitutional reasonableness of traffic stops. In *Whren*, the Court wrote that "the temporary detention of a motorist who the police have probable cause to believe has committed a *civil* traffic violation" does not offend the Fourth Amendment's prohibition against unreasonable seizures, even when the ulterior motive for the stop is not to enforce the traffic law. *Id.* at 808 (emphasis added). For its part, the D.C. Circuit, in *United States v. Mitchell*, 951 F.2d 1291, 1295 (D.C. Cir. 1991), could not be clearer in holding that "[t]he Fourth Amendment does not bar the police from stopping and questioning motorists when they witness or suspect a violation of *traffic laws, even if the offense is a minor one*." (emphasis added).[3]

---

[2]   The same argument is equally applicable to § 2401.2 and rests upon the faulty premise that violation of some of the District's traffic and vehicle regulations are criminal. All infractions of the traffic and vehicle regulations contained in Title 18 of the District of Columbia municipal regulations are civil.

[3]   The court assumes that there are some infractions involving automobiles, such as unpaid parking tickets, that would not provide a proper basis for the police to conduct a traffic stop. *See Minnesota v Holmes*, 569 N.W. 2d 181, 185 (Minn. 1997). However, their designation in the District's compilation of traffic and vehicle regulations is not the litmus test. A police officer who has reason to believe that a motorist has committed an infraction which concerns the proper operation of a motor vehicle as it affects the flow of traffic on city streets has the right to stop the motorist even if the infraction is designated as a "parking" infraction.

In sum, because Officer Omo had reasonable cause to believe that McKoy violated District of Columbia traffic laws, his stop of McKoy did not violate McKoy's rights under the Fourth Amendment.

**B.    WAS THE TIME THAT ELAPSED BETWEEN THE STOP OF McKOY AND THE SNIFFING OF THE CAR HE WAS OPERATING BY A DRUG DETECTION DOG IMPERMISSIBLY EXTENDED?**

Even if he was properly stopped for a traffic offense, McKoy asserts that the time that elapsed between the stop and Finnegan's sniff was impermissibly extended, particularly in view of the basis for the stop. Relying on *Illinois v. Caballes,* 543 U.S. 405 (2005), McKoy argues that his detention following his stop, unlike the stop under review in *Caballes*, was longer than necessary to conduct the tasks normally incident to a traffic stop and thus was impermissible.

Not unexpectedly, the Government disagrees and cites many cases in which the time that elapsed between a traffic stop and a canine sniff of the vehicle was as long as, or exceeded, the amount of time that elapsed here and reviewing courts have found that the duration of the stop did not run afoul of Fourth Amendment constraints. *See e.g.*, *United Sates v. Williams*, 429 F. 3d 767 (8th Cir. 2005) (traffic stop was not unreasonably prolonged where the wait for the drug sniffing dog was five to six minutes); *United States v. Carpenter*, 406 F.3d 915 (7th Cir. 2005) (traffic stop not unreasonably prolonged even if it was

10

extended by five minutes beyond the time necessary to issue a ticket for evading a red light and to conduct normal inquiries incident to such a stop); *United States v. Gregory*, 302 F.3d 805 (8th Cir. 2002) (a dog sniff of a car following a traffic stop did not unreasonably extend the length of the detention where dog sniff itself was not unduly lengthy, and just over twenty minutes elapsed from the beginning of the stop to the completion of the dog sniff); *United States v. White*, 42 F.3d 457 (8th Cir. 1994) (detention of one hour and twenty minutes to wait for a drug dog was reasonable where the officer acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available dog).

     A review of the case law reveals that there is no bright line demarcation for determining when a traffic stop has been impermissibly extended by a canine sniff. The determination is fact specific. Considering the totality of the circumstances here, the five to six minutes that was devoted only to Finnegan's drug detection activity, the duration of the stop of McKoy was not impermissibly extended given Omo's reasonable suspicion that crime was afoot.[4] The circumstances that lead the court to this determination include Omo's observations of the activity at 34th and Dubois that led him to suspect that

---

[4]     This time was the time that was nether associated with nor overlapped the time devoted to tasks incident to the traffic stop, that is, the time it took for Finnegan to be brought to the scene and to complete his sniff.

11

McKoy was involved with drug dealing and McKoy's statements and conduct after the stop that heightened that suspicion.[5]

McKoy's attempt to downplay the incriminating quality of the activity and statements Omo found suspicious by offering benign explanations for them is unconvincing and ignores governing principles. The law does not require nor permit the court to pigeonhole each fact Omo took into account as either innocuous or suspicious. Rather, the court is required to look at the totality of the circumstances and to appreciate that "[a]rriving at reasonable suspicion is a process dealing with probabilities, not hard certainties." *United States v. Lambert*, 351 F. Supp. 2d 1154,1160 (D. Kan. 2004). Further, the circumstances must be viewed from the perspective of one versed in the field of law enforcement. From this perspective, it is permissible and expected for a law enforcement officer to call on his experience and training to judge facts and perceive meaning in actions that appear innocuous to the untrained observer. Consequently, the circumstances here, properly viewed and analyzed, lead the

---

[5] These circumstances include Omo (1) observing the operator of a high-end automobile bringing it to a stop shortly before midnight in a location known for drug trafficking; (2) seeing a man running from a nearby apartment building, dressed only in a T-shirt, in the cold dead of winter, jump into the car and then leave it after twenty to thirty seconds, time enough for street drug sale; (3) being told by the operator of the car that he was going to get his haircut at a time when it is unlikely that a barber shop would be open; and (4) and lying about "having just dropped someone off."

court to conclude that Officer Omo had a reasonable and articulable suspicion that the Jaguar contained illegal drugs which justified the continued detention of McKoy for approximately six minutes to permit Finnegan to complete his drug detection sniff.

**C.     WAS MCKOY'S FOURTH AMENDMENTS RIGHTS VIOLATED BY FINNEGAN'S ENTRY INTO HIS CAR?**

Finally, McCoy challenges the admission of the evidence found in the Jaguar on the ground that his Fourth Amendment rights were violated when Finnegan entered his car, twice, before alerting to the presence of illegal drugs. The Government disagrees, asserting that Finnegan's conduct which was not guided or directed by his handler did not violate the Fourth Amendment.

In support of their respective positions, McKoy and the Government cite two cases decided by the Tenth Circuit, both of which addressed scenarios in which a drug detection dog entered an automobile by an open portal before alerting to the presence of drugs inside the automobile. In *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989), the defendant was stopped for speeding and told the officer who stopped him that he had been stopped earlier by the police. The officer asked to see the prior ticket, and in response, the defendant got out of the car, opened the vehicle's rear hatchback, and retrieved the ticket. A few minutes later, another police officer arrived with a drug detection dog. The dog circled the

13

car, showed interest underneath the rear area of the car and at the passenger door, and then jumped in the open hatchback, where he alerted on a duffel bag. The police then searched the entire car and duffel bag, finding controlled substances. The driver was indicted and later filed a pretrial motion to suppress the controlled substances, alleging that both the stop of his car and the subsequent search violated the Fourth Amendment. The trial court denied the motion to suppress and the Tenth Circuit affirmed the trial court's decision. The Tenth Circuit also agreed with the trial court's rationale for it decision, stating:

> We agree with the district judge that the dog's instinctive actions did not violate the Fourth Amendment. There is no evidence, nor does Stone contend, that the police asked Stone to open the hatchback so that the dog could jump in. Nor is there any evidence the police handler encouraged the dog to jump in the car. . . . In these circumstances, we think the police remained within the range of activities they may permissibly engage in when they have reasonable suspicion to believe an automobile contains narcotics.

*Id.* at 364. Though not stated explicitly, the doctrinal foundation upon which the holding of *Stone* rests is that in the absence of police misconduct there is no basis for applying the exclusionary rule.

In the other case, *United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998), border patrol agents stopped a van on the reasonable suspicion that it

14

might be carrying undocumented aliens. One of the agents approached the driver, the defendant, and asked for permission to search the van for illegal aliens, to which the defendant consented. The defendant was then asked to step out of the van. Soon thereafter, an agent opened the sliding door of the van and conducted a visual search of its interior. The agent saw no one inside, but he did not close the door; instead, the agent told the defendant that he also had information that the van was carrying narcotics and asked for permission to "run a dog on [the] vehicle." *Id.* at 1329. The defendant again agreed, and within several minutes a trained drug-sniffing dog arrived on the scene. During a scan of the vehicle, the dog's handler unleashed the dog. When the dog reached the open door, it jumped into the van and methodically sniffed its interior until it alerted at a rear vent. A search of the vent revealed fifty kilograms of marijuana and the defendant was subsequently arrested for possession with intent to distribute marijuana.

Agreeing that the defendant's Fourth Amendment rights had been violated, the Tenth Circuit affirmed the trial court's decision to suppress the evidence seized from the van. The Tenth Circuit found that the circumstances in the case *sub judice* differed from those in *Stone* in two material respects. First, the court stated that unlike the officers in *Stone*, who neither opened the hatchback door nor encouraged the dog to enter the vehicle, the agents in *Winningham* opened the door, allowing the van to sit on the side of the highway

15

with the sliding door wide open for a period of at least six minutes until the drug dog could arrive. The dog handler then unleashed the dog as the dog neared the open door. Thus, unlike in *Stone*, the agents facilitated the entry by the dog of the van operated by the defendant and without his consent. 140 F.3d at 1331.

Second, the court found that the officers in *Stone* were acting under reasonable suspicion, whereas the agents in *Winningham* were not:

> [R]easonable suspicion was exhausted [here] after [the agent] searched the van's interior. The subsequent policy activity — detaining the van for six minutes to await the dog and allowing the dog to sniff any portion of the van, internal or external — was permitted, if at all, by [the defendant's] consent, not by reasonable suspicion.

*Id.*

This case in material respects is similar to *Stone* not *Willingham*. Here, as in *Stone,* Finnegan's conduct in jumping into the Jaguar was instinctive and was not facilitated by police officers. Consequently, as in *Stone,* and unlike in *Willingham*, the police officers here did not engage in misconduct and, thus, there is no basis for applying the exclusionary rule.

### III. CONCLUSION

16

For the above stated reasons, defendant McKoy's motion to suppress evidence is **DENIED**.

                                                            Henry H. Kennedy, Jr.
                                                            United States District Judge